1

**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
Robert N. Fisher (SBN 302919)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
christina@chumphreylaw.com
rob@chumphreylaw.com

2

3

4

5

6

**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Sacramento, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
james.clark@towerlegalgroup.com
renee.ortega@towerlegalgroup.com

7

8

Attorneys for Plaintiff

9

10

11

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

12

13

14

15

16

17

18

19

20

21

22

23

JIM GRAMSTAD individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the VENTURA FOODS, LLC PROFIT SHARING 401(K) PLAN,

          Plaintiff,

     v.

VENTURA FOODS, LLC and DOES 1 through 10,

          Defendants.

Case No. _____

**CLASS ACTION COMPLAINT**

24

25

26

27

28

1

# **TABLE OF CONTENTS**

2  INTRODUCTION …………………………………………...………..…………..1

3  JURISDICTION AND VENUE…………………………...……………..………..3

4  THE PARTIES…………………………………………….…..………….........4

5  Plaintiff..………….......……………………………………….…..……………4

6  Defendants…………………………….……………………………..….……… 5

7  Parties in Interest………………….……...…...…………………..…………...... 5

8  DEFENDANTS' FIDUCIARY OBLIGATIONS…….……….…..……............... 6

9  DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE

10  FEES……………………………………………………………………...........7

11  THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS RELIED

12  UPON FOR THE COMPLAINT'S ALLEGATIONS…………………..….…..9

13  FACTUAL ALLEGATIONS………………………………...……………...…….....9

14       A.    Defendants Paid Transamerica and Gallagher and other Covered

15              Service Providers Unreasonable Fees, Failed to Monitor their Covered

16              Service Providers, and make Requests for Proposals from Other

17              Covered Service Providers……...…........................................9

18       B.    Defendants Caused the Plan Participants to Pay Excessive Fees and

19              Lose Returns by Failing to Offer, Monitor, and Investigate Available

20              Lower Cost Mutual Share Classes as Plan Investment Options…......15

21       C.    Defendants Maintained Imprudent Funds that Fell Below the

22              Reasonable Standard of Care and Which Lagged in Benchmark

23              Comparisons……………………………………………………… 21

24       D.    Defendants Imprudently Maintained the Plan's Investment in the

25              Prudential Guaranteed Income Stable Value Fund, When Other

26              Investment Vendors Offered Superior Alternatives…………………27

27       E.    CLASS ACTION ALLEGATIONS……………..........……….....32

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence (Against All Defendants)……………………………………….........................................34

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers (Against All Defendants)…….…………………….…………………………………………..36

PRAYER FOR RELIEF……………………………………………......………...38

CLASS ACTION COMPLAINT

1    Plaintiff Jim Gramstad ("Plaintiff"), individually and as a representative of
2    participants and beneficiaries of the VENTURA FOODS, LLC PROFIT SHARING
3    401(K) PLAN, (the "Plan"), brings this action under the Employee Retirement
4    Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, on
5    behalf of the Plan against current Plan sponsor, VENTURA FOODS, LLC and John
6    Does 1-10 (collectively the "Defendants"), for breaching their fiduciary duties in
7    the management, operation and administration of the Plan.

8    ## INTRODUCTION

9    1.     This action is brought by current and former employees / participants /
10   beneficiaries of Defendants' Plan to recover losses due to mismanagement of the
11   401k retirement plan and certain selected funds.  The 401k plan has become the
12   dominant source of retirement savings for most Americans.  Unlike defined-benefit
13   pensions, which provide set payouts for life, 401(k) accounts rise and fall with
14   financial markets, and therefore, the proliferation of 401(k) plans has exposed
15   workers to big drops in the stock market and high fees from Wall Street money
16   managers.  This action is filed to recover funds owed back to the plan on behalf of
17   employees / participants / beneficiaries.  These retirement funds are significant to the
18   welfare of the class.

19   2.     Federal law affords employers the privilege of enticing and retaining
20   employees by setting up retirement and defined contribution plans pursuant to 26
21   U.S.C. § 401 ("401(k) plans).  These plans provide employees investment options
22   with tax benefits that inure to the benefits of the employees and, necessarily, to the
23   employers by increasing the "net" compensation their employees receive via tax
24   deferment.  To enjoy this benefit, employers must follow the rules and standards
25   proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §
26   1001, *et seq.* ("ERISA").

27   3.     The Defendants chose to accept the benefits of federal and state tax
28   deferrals for their employees via a 401(k) plan, and the owners and executives of

CLASS ACTION COMPLAINT

Defendant organizations have benefitted financially for years from the same tax benefits.  However, Defendants have not followed ERISA's standard of care.  This lawsuit is filed after careful consultation with experts and review of publicly available documents to return benefits taken from Plan participants by Defendants.

4.      The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.  As of December 31, 2021, the Plan had 2,954 total participants and $322,701,158 in assets.

5.      ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1).  A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id.*  A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

6.      Specifically, Defendants breached their fiduciary duties of prudence and loyalty to the Plan by:

a. Overpaying for Covered Service Providers by paying variable direct and indirect compensation fees through revenue sharing arrangements with the funds offered as investment options under the Plan, which exceeded costs incurred by plans of similar size with similar services and which were in excess of and not tethered to the services provided;

b. Offering and maintaining funds with higher-cost share classes when identical lower cost class shares were available and could have been offered to participants resulting in participants/beneficiaries paying unnecessary costs for services that provided no value to them and resulted in a reduction of compounded return gains;

c. Retaining and Offering poorly performing funds within the Plan which failed to meet or exceed industry standard benchmarks including Morningstar category indices and best fit indices as determined by Morningstar.

d. Deprived participants of compounded returns through the excessive costs and investment in expensive underperforming funds;

and

e. Failing to maintain and restore trust assets.

7.     Plaintiff was injured during the Relevant Time Period by the Defendants' flawed processes in breach of their fiduciary duties.  As a result of Defendant's actions, participants invested in subpar investment vehicles and paid additional unnecessary operating expenses and fees with no value to the participants and resulting in a loss of compounded returns.

8.     Plaintiff, individually and as the representative of a putative class consisting of the Plan's participants and beneficiaries, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiff seeks to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the

CLASS ACTION COMPLAINT

1  United States, and exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C.
2  §1132(e)(1).

3       11.    This Court has personal jurisdiction over Defendants because they
4  transact business in this District, reside in this District, and/or have significant
5  contacts with this District, Plaintiff resides and was employed in this District, and
6  because ERISA provides for nationwide service of process.

7       12.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29
8  U.S.C. § 1132(e)(2), because the Plan is administered in this District, many
9  violations of ERISA took place in this District, and Defendants conduct business in
10 this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)
11 because Plaintiff was employed in this District and a substantial part of the events or
12 omissions giving rise to the claims asserted herein occurred within this District.

13                          **THE PARTIES**

14 *Plaintiff*

15      13.    Plaintiff Jim Gramstad resides in Fullerton, CA and is an employee of
16 Ventura Foods, LLC and worked for Ventura Foods, LLC in this district.  Gramstad
17 was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time
18 Period and upon information and belief invested in some or all of the funds which
19 are at issue in this action. Gramstad was damaged by the Defendants' breaches of
20 their fiduciary duties which impacted the Plan as a whole and damaged all Plan
21 participants.

22      14.    Plaintiff has standing under 29 U.S.C. § 1132(a)(2) to bring this action
23 on behalf of the Plan because Defendants' reckless and insouciant actions caused
24 actual harm to an ERISA plan in which the Plaintiff participates. Plaintiff suffered an
25 injury in fact by, *inter alia*, being forced to pay excessive fees to Fund service
26 providers, investing in higher cost mutual fund shares when lower cost shares of the
27 same fund were available to the Plan, being offered funds which failed to perform at
28 or above their benchmarks, and being deprived of a high quality and secure stable

-4-
CLASS ACTION COMPLAINT

value investment option. Defendants are liable to the Plan for the Plan's losses under 29 U.S.C. § 1109(a).

***Defendants***

15.     Defendant Ventura Foods, LLC ("Ventura Foods") is the current sponsor of the Plan and maintains its principal place of business at 40 Pointe Drive, Brea, CA 92821.  Ventura Foods is registered with the State of California, and upon information and belief, operates as a sponsor and administrator and/or fiduciary of the Plan.

16.     Defendant "Does" or the names of the individuals on the Board of Directors and related Committee(s), including the Plan's Investment Committee, if such committee exists, as well as the Plan's manager, and Ventura Foods's officers during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through amendment to this Complaint.

17.     Ventura Foods, the Board of Directors, the Plan Investment Committee, the Plan's manager, and the Directors and Officers are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

***Parties in Interest***

18.     Finally, although not named as a Defendants, the covered service providers serve as "Parties of Interest" to this Litigation.

19.     Ventura Foods contracted with Gallagher Benefit Services ("Gallagher"), to serve as the Plan's Investment Advisor.  Gallagher served as

CLASS ACTION COMPLAINT

1   investment fiduciary during the relevant time period based on Schedules C certified
2   returns filed by Ventura Foods.

3        20.    Ventura Foods contracted with Transamerica Retirement Solutions
4   ("Transamerica"), to serve as the Plan's recordkeeper. Transamerica served as
5   investment fiduciary during the relevant time period based on Schedules C certified
6   returns filed by Ventura Foods.

7        21.    Ventura Foods contracted with State Street Bank and Trust Company
8   ("State Street") to serve as Trustee.  In this capacity, State Street received and held
9   the assets of the Fund on behalf of the Participants and Beneficiaries.

10        22.    Ventura Foods and the Plan Committee had a concomitant fiduciary
11   duty to monitor and supervise those appointees and contracted parties.

## **DEFENDANTS' FIDUCIARY OBLIGATIONS**

13        23.    ERISA and common law trusts imposes strict fiduciary duties of loyalty
14   and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A)
15   requires a plan fiduciary to "discharge his duties with respect to a plan solely in the
16   interest of the participants and beneficiaries" for the "exclusive purpose of (i)
17   providing benefits to participants and their beneficiaries; and (ii) defraying
18   reasonable expenses of administering the plan."

19        24.    29 U.S.C. § 1104(a)(1)(B) and common law requires a plan fiduciary to
20   discharge his obligations "with the care, skill, prudence, and diligence under the
21   circumstances then prevailing that a prudent man acting in a like capacity and
22   familiar with such matters would use in the conduct of an enterprise of like character
23   and with like aims."

24        25.    A fiduciary's duties include a continuing duty to monitor investments
25   and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. at 1829.

26        26.    29 U.S.C. § 1106(a)(1)(C) and § 1108(b)(2) and the common law allow
27   a fiduciary of an employee benefit plan to enter into an agreement with a party in
28   interest for the provision of administrative services such as recordkeeping to the Plan

1    "if no more than reasonable compensation is paid therefor." Gallagher and

2    Transamerica are "parties in interest" under 29 U.S.C. § 1106(a)(1)(C).

3          27.    29 U.S.C. § 1132(a)(2) and common law authorizes a plan participant to

4    bring a civil action to enforce a breaching fiduciary's liability to the plan under 29

5    U.S.C. § 1109.

6          28.    Section 1109(a) and common law provides "[a]ny person who is a

7    fiduciary with respect to a plan who breaches any of the responsibilities, obligations,

8    or duties imposed upon fiduciaries by this subchapter shall be personally liable to

9    make good to such plan any losses to the plan resulting from each such breach."

10    "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the

11    trust beneficiaries to the position they would have occupied but for the breach of

12    trust." Restatement (Second) of Trusts § 205(c) (1959).

13
14

**DEFINED CONTRIBUTION 401(K) PLANS
AND THE IMPACT OF EXCESSIVE FEES**

15          29.    In a defined contribution plan, participants (and sometimes their

16    employer) make contributions to plan participant's individual accounts. Participants'

17    retirement benefits are limited to the value of their own individual accounts, which is

18    determined solely by employee and employer contributions plus any investment

19    gains less plan and investment expenses. *See* 29 U.S.C. § 1002(34). Plan

20    Participants' investments are held in trust. Typically, plan participants direct the

21    investment of their accounts, choosing from the lineup of plan investment options

22    chosen by the plan sponsor.

23          30.    Because retirement savings in defined contribution plans are intended to

24    grow and compound over the course of the employee participants' careers, poor

25    investment performance and excessive fees can dramatically reduce the amount of

26    benefits available when the participant is ready to retire. Over time, even small

27    differences in fees and performance compound which can result in vast differences

28    in the amount of savings available at retirement. As the Supreme Court explained,

-7-

"[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825. In short, the damages caused by breaches of fiduciary duties to the Plan cause damages that continue to accrue and compound over time.

31. In fact, the impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

32. As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time.

33. Accordingly, courts have recognized that plan fiduciaries "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016).

//

//

---

[1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

34.    The marketplace for retirement plan services is established and competitive. As of December 31, 2021, the Plan had 2,954 active participants and $322,701,158 in assets. As a result, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds.

## THE ESTABLISHEMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

35.    Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and available for download from www.efast.dol.gov for forms filed in 2010 and onward).

36.    Plaintiff also requested Defendants Plan governing documents and this Complaint is based in part on the limited documents provided by Defendants.

37.    The underlying allegations in this Complaint are based on Plaintiff's documents as well as the Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar.

## FACTUAL ALLEGATIONS

**A.    Defendants Paid Transamerica and Gallagher and other Covered Service Providers Unreasonable Fees, Failed to Monitor their Covered Service Providers, and make Requests for Proposals from Other Covered Service Providers**

38.    Defendants have a duty to prudently select covered service providers ("CSPs"). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation.  Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[2] The DOL has observed that,

---

[2] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." *Id*. Such a process must be "designed to elicit information necessary to assess . . . the reasonableness of the fees charged in light of the services provided." *Id*.

39.     Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

40.     The cost of recordkeeping and administrative services depends on the number of participants, not the amount of assets in the participant's account.

41.     The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is for upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

42.     Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

43.     Recordkeepers for defined contribution plans are generally compensated in two ways: First, through direct payments from the plan (participants) or employer; and second, through indirect payments via a practice known as revenue sharing.

44.      In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include:

Rule 12b-1 fees, which are paid by the Funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of Fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered.

45.     Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids. Defendants did not do that here.

46.     Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable recordkeeping fees. To put it another way, recordkeepers (or any other CSP) receiving unchecked revenue sharing compensation accrue significant ongoing pay increases simply as a result of participants putting money aside biweekly for retirement. Additional funds come from interest, dividends and capital gains.

47.     Thus, for example, in 2016, the Plan paid Transamerica approximately $718,000 even though Transamerica had provided the same services for approximately $584,516 the year before.

48.     Based on the number of Plan participants and the assets in the Plan, a reasonable recordkeeping fee for the Plan is approximately $40 per participant (15th Annual NEPC 2020 Defined Contribution Plan & Fee Survey: https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

49.     In 2013, Defendants chose Transamerica to serve as the Plan's recordkeeper with Gallagher to serve as investment advisor from 2012 to the present.

1  50.    Based on the direct and indirect compensation levels shown on the
2 Plan's Form 5500s filed with the Department of Labor covering the years between
3 2013 and 2022, the Plan paid much more than a reasonable fee for Transamerica and
4 Gallagher's services, resulting in the Plan paying millions of dollars in excessive fees
5 as shown in the tables below.





Recordkeeping Fees - Transamerica

51.     There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

52.     The package of recordkeeping services the Plan received included standard recordkeeping services such as: government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

53.     The Plan did not receive any unique services or at a level of quality that would warrant fees greater than the competitive fees that would be offered by other providers.

54.     The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like the Ventura Foods Plan with large numbers of participants and a large amounts of assets.

55.     The unreasonable fees paid to covered service providers through revenue sharing arrangements directly resulted from Defendants' choice of improper mutual fund share classes and failing to monitor the providers.

56.     The mutual funds paid annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Plan participants who invested in those funds. The Plan participants realized lower returns on their investments because they paid higher fund operating expenses.

57.     The clear explanation for this is that Defendants have a flawed and reckless provider selection process that is "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

58.     As discussed below, in most years, many of the funds offered to the participants had less expensive share classes available.  Defendant's use of higher cost share classes to pay service provider costs is the most inequitable, inefficient and expensive method available.

59.     Defendants clearly failed to use the Plan's bargaining power to leverage its CSPs to charge lower administrative fees for the Plan participants.

60.     Defendants failed to take any or adequate action to monitor, evaluate or reduce their service provider fees, such as:

    a.  Choosing mutual fund share classes with lower revenue sharing for the Plan;

    b.  monitoring costs to compare with the costs being charged for similar sized plans in the marketplace; or

    c.  negotiating to cap the amount of revenue sharing or ensure that any excessive amounts were returned to the Plan.

61.     The amount of compensation paid to CSPs vastly exceeds any DOL and IRS prohibited transaction "reasonable compensation" exemption for "cost plus reasonable profit."

62.     In sum, the Plan unreasonably paid broker dealer intermediaries like Gallagher and Transamerica fees far in excess of what the Plan needed to pay for their services and these fees were not tethered to the actual services rendered, but rather increased based on revenue sharing of a larger corpus of Plan funds over time.

63.     ERISA holds fiduciaries "to a high standard of care and diligence" regarding fees: Fiduciaries must, among other things, "[e]stablish a prudent process for selecting investment options and service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor investment options and service providers once selected to make sure they continue to be appropriate choices." Additionally, The Department of Labor has consistently reminded ERISA fiduciaries of their responsivities to carefully evaluate fees when selecting plan investment options and then monitor fees on an ongoing basis.  Defendants breached their fiduciary duties by failing to conduct themselves accordingly.

**B.      Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options**

64.     Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

65.     Mutual funds often offer multiple "classes" of their shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class.

66.     A mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund to one share class, while charging a higher class share in that same fund an expense ratio of .50%.  Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher operating expense. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan.

67. Plans that invest their participants' funds in lower share classes and subject them to higher fees engage in share class violations which are the most clear and obvious breaches of fiduciary duties in the Plan. *See Tibble v. Edison*, 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017) ("Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.").

68. Since at least 2016, Defendants have offered higher cost mutual fund share classes as investment options for the Plan even though at all times lower cost class shares of those exact same mutual funds were readily available to the Plan.

69. Indeed, Defendants have provided as many as 14 fund choices with clear share class violations.

70. Defendants selected the Plan's investment options. In this case, on information and belief, Transamerica, the Plan's recordkeeper, and Gallagher, the Plan's investment advisor, provided Defendants with a universe of pooled investment options from which to select a subset to offer Plaintiff and the other Plan participants.

71. Defendants chose and continued to maintain a pool of investment options including those offered by Transamerica and Gallagher at the expense of participants and beneficiaries of the Plan by routinely offering higher cost share classes rather than readily available lower cost options.

**Summary Table**

| | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|---|
| Total Funds # | 32 | 31 | 31 | 31 | 31 | 32 |
| Cheaper Shares Classes Available # | 8 | 11 | 12 | 13 | 13 | 14 |
| Cheaper Shares Classes Available % | 25% | 35% | 39% | 42% | 42% | 44% |

72. The following chart illustrates the differences in the operating costs and returns between the share classes chosen by Defendants and the least expensive share

CLASS ACTION COMPLAINT

class available as of January 1, 2016 for funds that were in the Plan during the entire six year period ending December 31, 2021.

73.     The fund name listed in the first row and shaded grey represents the share class chosen by Defendants.  The second fund name listed and <u>not</u> shaded represents the cheaper share class Defendants should have chosen which was available to them throughout the duration of the Plan.  The bolded line represents the difference in costs (expenses charged), 12-month yield and the investment returns for the one- and annualized three- and five-year – and six year performance periods ending 12/31/2021.

74.     Additionally, to highlight the harm caused by the Defendants' imprudent selection of high-cost share classes, the three-five-six- year cumulative returns are included, which shows the compounding effect of excess fees paid over the course of each year.

**COST OF EXPENSIVE SHARE CLASS FOR FUNDS IN PLAN THROUGHOUT ENTIRE CLASS PERIOD**

**Cumulative (Total) Returns (Ending 12/31/21)**

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 6-Year Total | 6-Year % / 6* | 2016 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|
| T. Rowe Price Blue Chip Growth Advisor (2016) | 0.95 | 17.39 | 104.44 | | 185.22 | | $31,413,361 | |
| T. Rowe Price Blue Chip Growth I | 0.56 | 17.85 | 106.88 | | 192.16 | | | |
| *Cost of Expensive Share Classes* | *-0.39* | *-0.46* | *-2.45* | *-0.82* | *-6.94* | *-1.39* | | *-$2,180,449.45* |
| Columbia Dividend Income A (2013) | 0.92 | 25.99 | 73.16 | | 125.08 | | $8,762,426 | |
| Columbia Dividend Income Inst3 | 0.56 | 26.45 | 75.08 | | 130.33 | | | |
| *Cost of Expensive Share Classes* | *-0.36* | *-0.46* | *-1.92* | *-0.64* | *-5.25* | *-1.05* | | *-$459,830.04* |

CLASS ACTION COMPLAINT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Janus Henderson Enterprise A (2016) | 1.13 | 16.97 | 89.03 | | 162.73 | | $1,164,004 |
| Janus Henderson Enterprise N | 0.66 | 17.50 | 91.61 | | 170.02 | | |
| *Cost of Expensive Share Classes* | *-0.47* | *-0.53* | *-2.59* | *-0.86* | *-7.29* | *-1.46* | *-$84,834.42* |
| Virtus Ceredex Mid-Cap Value Equity A (2012) | 1.28 | 28.73 | 68.15 | | 106.00 | | $1,516,084 |
| Virtus Ceredex Mid-Cap Value Equity R6 | 0.79 | 29.34 | 70.76 | | 113.00 | | |
| *Cost of Expensive Share Classes* | *-0.49* | *-0.61* | *-2.61* | *-0.87* | *-7.00* | *-1.40* | *-$106,125.97* |
| Janus Henderson Triton A (2012) | 1.29 | 6.74 | 75.02 | | 130.79 | | $2,926,037 |
| Janus Henderson Triton N | 0.66 | 7.21 | 77.40 | | 137.16 | | |
| *Cost of Expensive Share Classes* | *-0.63* | *-0.47* | *-2.38* | *-0.79* | *-6.37* | *-1.27* | *-$186,421.39* |
| American Funds Europacific Growth A (2009) | 0.80 | 2.50 | 62.39 | | 81.23 | | $7,834,729 |
| American Funds Europacific Growth R6 | 0.46 | 2.84 | 64.11 | | 85.04 | | |
| *Cost of Expensive Share Classes* | *-0.34* | *-0.33* | *-1.73* | *-0.58* | *-3.81* | *-0.76* | *-$298,547.91* |
| American Funds SMALLCAP World A (2009) | 1.02 | 10.27 | 98.16 | | 140.03 | | $23,196,859 |
| American Funds SMALLCAP World R6 | 0.65 | 10.66 | 100.39 | | 145.41 | | |
| *Cost of Expensive Share Classes* | *-0.37* | *-0.39* | *-2.22* | *-0.74* | *-5.39* | *-1.08* | *-$1,249,367.05* |

-18-

CLASS ACTION COMPLAINT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Invesco Developing Markets A (2012) | 1.20 | -7.50 | 34.44 | | 70.16 | | $1,343,651 |
| Invesco Developing Markets R6 | 0.81 | -7.13 | 36.08 | | 74.42 | | |
| *Cost of Expensive Share Classes* | *-0.39* | *-0.37* | *-1.64* | *-0.55* | *-4.26* | *-0.85* | *-$57,278.67* |
| American Funds Income Fund of Amer A (2009) | 0.56 | 17.38 | 46.52 | | 74.30 | | $6,434,545 |
| American Funds Income Fund of Amer R6 | 0.25 | 17.73 | 47.86 | | 77.42 | | |
| *Cost of Expensive Share Classes* | *-0.31* | *-0.35* | *-1.33* | *-0.44* | *-3.12* | *-0.62* | *-$200,905.22* |

\* The 3-Year %/3 and 5-Year %/5 figures illustrate that the cost to participants in lost returns is typically greater than the charged annual expenses. This lost return differential is not adequately expressed in the annualized figures.

75.    Defendants may seek to explain that they offered higher cost share classes with higher fee burdens by pointing to the Plan's ability to use those fees for revenue sharing arrangements.  But this does not justify the increased fees and lost returns imposed on Plan participants.  Rather, empirically speaking, revenue sharing burdens on mutual fund investors are *always* more costly than the revenue sharing credit offered by the corresponding mutual fund share class.

76.    In other words, investing Plan assets in higher cost share classes does not benefit plan participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants.

77.    Because the Plan could have invested in identical mutual funds with a lower cost share class, the Defendants' actions were directly erosive to the trust's growth.

78.    Defendants thus caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of

those higher fees on many of the mutual funds offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

79.    In selecting share classes with higher fees, Defendants demonstrated a lack of basic skill and prudence when selecting investments.

80.    Defendants failed to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants.

81.    Lastly, the information available for Defendants to make an informed assessment as to costs and returns available for each share class and to make the assessments noted above was made available in each fund's annual prospectus at the time the choices were made.

82.    The Defendants' actions to choose high-cost *index* funds demonstrates a lack of prudence.  For example, as shown in the chart above, the T. Rowe Price Blue Chip Growth expensive share class had fees of ninety-five basis points (0.95%/yr) as opposed to the share class with lower fees of fifty-six basis points (0.56%/yr).  The total fees paid for the share class with higher fees was therefore thirty-nine basis points per year (0.39%/yr).

83.    In other words, Defendants caused Plan participants who invested in that T. Rowe Price fund to pay .39% more in fees than necessary and permitted plan's contracted recordkeeper and/or financial advisor to collect a portion of those increased fees.

84.    Additionally, an analysis of each attribute of the different share classes reveals that there is <u>no</u> difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants.

85.    Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above.  In devising and implementing strategies for the investment and management of trust assets,

1  trustees are obligated to "minimize costs."   Uniform Prudent Investor Act (the

2  "UPIA") §7.

3      86.    As is evident from the allegations in the Complaint, Defendants did not

4  systemically and regularly review or institute other processes in place to fulfill their

5  continuing obligation to monitor Plan investments and reduce Plan costs, or, in the

6  alternative, failed to follow the processes, as evidenced by the offering of higher cost

7  share classes as Plan investment options when lower cost options of the same funds

8  were available.

9      87.    A prudent fiduciary conducting an impartial review of the Plan's

10  investments would have identified the cheaper share classes available and transferred

11  the Plan's investments in the above-referenced funds into the lower share classes at

12  the earliest opportunity.   The total amount of excess mutual fund expenses paid by

13  Plan participants over the past six years, which correspondingly reduced the return

14  on the Plan participants' investments, resulted in millions of dollars of damages to

15  participants.

16  **C.    Defendants Maintained Imprudent Funds that Fell Below the Reasonable**
    **Standard of Care and Which Lagged in Benchmark Comparisons**

17

18      88.    Mutual fund portfolio managers choose a benchmark index to use in

19  their prospectus as a comparison for evaluating fund performance often referred to as

20  the Primary Prospectus Benchmark ("PPBM").

21      89.    However, in addition to the PPBM selected by the fund managers

22  themselves, third parties may provide more appropriate comparators for each fund

23  than the fund-selected comparator.

24      90.    Morningstar, Inc. ("Morningstar") is one such third party and a

25  respected financial services company that provides research and analytics that are

26  used throughout the asset management industry.

27      91.    In 1996, Morningstar created category classifications to help investors

28  make meaningful comparisons between mutual funds.

92.     "Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested" and Morningstar "solved this problem by breaking portfolios into peer groups based on their holdings" which "help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios."[3]

93.     Per Morningstar,

[t]he driving principles behind the classification system are as follows:

- Individual portfolios within a category invest in similar types of securities and therefore share the same risk factors (for example, style risk, prepayment risk).
- Individual portfolios within a category can, in general, be expected to behave more similarly to one another than to portfolios outside the category.
- The aggregate performance of different categories differs materially over time.
- Categories have enough constituents to form the basis for reasonable peer group comparisons.
- The distinctions between categories are meaningful to investors and assist in their pursuit of investing goals.[4]

94.     Critically, Morningstar determined that funds may select broad-based market comparators as their primary benchmark and that the funds may reflect a "low degree of correlation" with the corresponding benchmark.[5]

95.     In order to provide a better measure of fund performance, Morningstar publishes data on each fund's performance compared to Morningstar selected benchmarks.

//

//

---

[3] http://morningstardirect.morningstar.com/clientcomm/morningstar_categories_us_april_2016.pdf

[4] *Id.*

[5] https://www.morningstar.com/articles/372237/understanding-best-fit-versus-standard-indexes

96.     First, the Morningstar Category Index ("MCI") is a category specific index that allows investors and advisors to compare fund performance to benchmarks that may be a better fit to the true makeup of a fund than the fund-selected PPBM.

97.     MCIs are commonly used as comparators in investment selection, monitoring and reporting tools used by investment managers and 401(k) investment committees.  MCI comparisons can be beneficial because they typically represent the weighted returns of the vast majority of investments within a specific asset-class (i.e. large-cap growth or small-cap value) which allows those selecting and monitoring investments to better identify risk and return derivations between the mutual funds they are reviewing.

98.     Second, Morningstar selects a Best-Fit Index ("BFI") for each fund based on the composition of the fund over the prior 36-month period.[6]  Because the fund is highly correlated to its BFI, comparison of a fund to its BFI makes it is easier to determine how much of a fund's movements are based on the movements of the index, the relative level of risk a portfolio manager is taking, and ultimately whether a portfolio manager is adding value.

99.     The MCI and BFI are strong comparators and useful tools for evaluating fund performance because portfolio managers of funds with the same investment purpose make buy and sell decisions based on the same pool of investments (stocks and/or bonds). These benchmarks help investors determine whether a specific portfolio manager has skill determining what assets to hold within that pool and how much to over/underweight certain investments and when to buy and sell.

100.   When evaluating fund performance, a prudent fiduciary considers data on a fund's performance against all relevant benchmarks including its MCI and BFI when evaluating fund performance because those comparators evaluate whether the fund is performing well based on the actual purpose and design of the fund.

---

[6] *Id.*

101.   Here, as demonstrated in the charts below, several of the funds offered by   the Plan during the statutory period showed poor performance during the statutory period as compared to both their MCI and BFI.

**Challenged Funds' Cumulative Returns vs Best Fit Index[1]**

| Year Selected | Year Removed | Ticker | Fund Name | Best-Fit Index (BFI) | +/- BFI since Selection [2] | +/- BFI For Prior Six Year Period | Cost to Participants during Prior Six Year Period [3] |
|---|---|---|---|---|---|---|---|
| 2016 | In Plan | PABGX | T. Rowe Price Blue Chip Growth Adv | Morningstar US LM Brd Growth TR USD | (24.22) | (24.22) | ($7,606,843.06) |
| 2012 | In Plan | ODMAX | Invesco (Oppenheimer) Developing Markets A | MSCI EM NR USD | 11.66 | (7.90) | ($106,081.33) |
| 2009 | 2019 | OAKBX | Oakmark Equity and Income Investor | Russell Mid Cap Value TR USD | (5.41) | (2.39) | ($391,020.41) |
| | | | | | | | ($8,103,944.80) |

**Challenged Funds' Cumulative Returns vs Morningstar® Category Index[1]**

| Year Selected | Year Removed | Ticker | Fund Name | Morningstar Category Index (MCI) | +/- MCI since Selection [2] | +/- MCI For Prior Six Year Period | Cost to Participants during Prior Six Year Period [3] |
|---|---|---|---|---|---|---|---|
| 2016 | In Plan | PABGX | T. Rowe Price Blue Chip Growth Adv | Russell 1000 Growth TR USD | (45.74) | (45.74) | ($14,367,521.70) |
| 2012 | In Plan | ODMAX | Invesco (Oppenheimer) Developing Markets A | MSCI EM NR USD | 11.66 | (7.90) | ($106,081.33) |
| 2009 | 2019 | OAKBX | Oakmark Equity and Income Investor | Morningstar Mod Agg Tgt Risk TR USD | (1.81) | (2.15) | ($351,013.27) |
| | | | | | | | ($14,824,616.30) |

1) Table based on data through 12/31/2021
2) "Since selection" is based on year selected through the last full year held in the plan
3) Based on 2016 beginning year assets

CLASS ACTION COMPLAINT

102.   As shown in the tables above, Defendants breached their duty to the Plan to engage in an ongoing process to cull poorly performing funds from the Plan resulting in millions of dollars of losses to the Plan.

103.   For example, a prudent fiduciary would not have continued to invest the Plan's funds in the T. Rowe Price Blue Chip Growth Fund and would have offered a different growth investment option, rather than subjecting participants to continue to suffer losses.

104.   In this regard, the T. Rowe Price Blue Chip Growth fund had a single highly regarded manager from 1993 until 2021.  As early as 2020, it was reported that this long-time manager would transition out of the fund in the near future and new fund manager began to take the reigns as associate portfolio manager at the beginning of 2020.

105.   This should have sent up a red flag.  Indeed, in August of 2020, Morningstar downgraded the fund.

106.   The fund has, in fact, performed poorly during and since the transition, including trailing its MCI by 4.13% in 2020 and 10.21% in 2021.

107.   Moreover, the fund had already begun to perform poorly in 2019, trailing its MCI by 6.77%.

108.   The fund likewise underperformed other comparable funds as determined by Morningstar, performing in the 4th quartile for its Morningstar category in 2016 and again in the 4th quartile in 2019 and the 3rd quartile in 2021.

109.   Currently Morningstar has assigned a 2 star rating to the fund.  The funds 3-year performance is rated as a dreadful single star, with a 2 star 5-year performance ranking and only a 3-star 10-year performance ranking.

110.   Rather than gambling on the fund's uncertain future success, a prudent fiduciary would have removed the fund based on its poor performance and new management.

//

CLASS ACTION COMPLAINT

111.   Instead, Defendants have continued to maintain the Plan's investment in the fund through at least November 30, 2022.

112.   During the course of 2022, the fund is down 38.64% (through December 19, 2022) and is performing in nearly the bottom 10% of its Morningstar category.  Accordingly, Defendants continued refusal to make the prudent move of removing the fund has caused further damages to the Plan. On top of this, as discussed above, the Plan has improperly maintained a more expensive share class causing Plan participants who invested in this fund to pay excessive fees.

113.   Likewise, the Plan fiduciaries should have removed the Invesco (Oppenheimer) Developing Markets fund from the Plan based on consistent and longstanding underperformance.

114.   The fund, which has a single benchmark as its PPBM, BFI, and MCI, underperformed its benchmark during the Class Period.

115.   This underperformance began in 2014 and included years of underperformance in 2016, 2017, 2020, 2021, and continuing through 2022.

116.   During that time, the fund was in the 4th quartile for performance in its Morningstar category in 2014 and 2021 and thus far in 2022, and in the 3rd quartile in 2015-17 and was in the 3rd or 4th quartile for 4 straight years from 2014-17. These poor peer rankings serve to emphasize that it would not have been difficult to identify a more prudent investment option.

117.   On top of this, as discussed above, the Plan has improperly maintained a more expensive share class causing Plan participants who invested in this fund to pay excessive fees.

118.   So too, the Oakmark Equity and Income Investor fund should have been removed from the Plan prior to 2019 when it was finally removed.

119.   The fund lagged its PPBM, MCI, and BFI during the Class Period.

120.   It also had a number of years of poor performance prior to and during the Class Period and appeared in the third and fourth quartile compared to its

1  Morningstar category peers in 2009 (4th), 2010 (4th), 2012 (4th), 2015 (4th), 2017

2  (3rd), 2018 (3rd), and 2019 (4th).

3      121.   On top of this, the Plan improperly maintained a more expensive share

4  class causing Plan participants who invested in this fund to pay excessive fees.

5      122.   Defendants have a continuing duty to evaluate the Plan funds and

6  remove underperforming funds.

7      123.   Defendants were or should have been aware of the continuous

8  underperformance of the funds enumerated in the charts and discussed above and

9  removed the funds from the Plan.

10      124.   Defendants' failure to remove these funds from the Plan reflects either

11  that Defendants failed to put in place a prudent investment monitoring process or

12  failed to engage in that process.

13      125.   Accordingly, Defendants breached their fiduciary duties by failing to

14  remove the funds resulting in financial losses to the Plan and its participants.

15  **D.    Defendants Imprudently Maintained the Plan's Investment in the
          Prudential Guaranteed Income Stable Value Fund, When Other**

16  **Investment Vendors Offered Superior Alternatives**

17      126.   The Prudential Guaranteed Income Stable Value Fund (Separate

18  Account Guaranteed Investment Account or "GIC")) is a type of stable value fund.

19      127.   As discussed below, the Prudential GIC, which is established by

20  contract between the Plan and Prudential is a risky and poor investment product that

21  should not have been offered by the Plan because, *inter alia*, it is subject to the single

22  entity credit risk of Prudential, the issuer of the contract, the crediting rate is set in

23  advance by Prudential and reset from time to time in Prudential's sole discretion and

24  is not tied to the performance of a diversified pool of assets in which the investors in

25  the fund have an interest, and it allows Prudential to obtain excessive spread fees.

26      128.   Stable value funds generally are not SEC registered mutual funds.

27  Single Company fixed annuity contracts that are structured as an insurance company

28  general account, or an insurance company separate account, are solely regulated by

the State Insurance Commissioner selected by the insurance company. Synthetic based stable value funds are run by a Registered Investment Advisor (RIA) regulated by the SEC but use a small amount of synthetic GIC's which sometimes are state regulated. The differences between the different types of funds are critical from a fiduciary standpoint.

129.   A stable value account in a retirement plan is (i) similar to a money market fund in that it is intended to provide principal protection, and (ii) similar to a bond fund in that it provides consistent returns over time. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to (in theory) guarantee participants will not lose money by ensuring the fund transacts at book value. Synthetic Stable value accounts "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds.[7]   Single fixed annuity contracts are set by the insurance company at their discretion.

130.   The 401(k) marketplace for the largest plans, if they offer stable value funds, typically offer "synthetic" stable value funds, which are the least risky, because the fund owns the securities in the underlying funds which typically are 95%+ of the funds value.  The annuity part, or wrap, is not only typically divided between insurers but only typically comprises 1-5% of the value at risk.   While the majority of plans the size of Ventura Foods use a lower risk synthetic stable value product, there are still some Separate Account and General Account products.

131.   Separate account products, such as the Prudential GIC, where the assets of the underlying funds are held in the separate account of an insurance carrier

---

[7] *See* Stable Value Fund v. Money Market Fund, Financial Web describing difference between stable value funds and money market funds), available at:
http://www.finweb.com/investing/stable-value-fund-vs-money-market-fund.html#axzz44EaLfQnQ

1    are riskier, because they are not owned by the Plan but sit on the balance sheet of the

2    insurer where they take on near 100% of the single entity credit and liquidity risk of

3    Prudential.

4         132.   In recent years, large 401(k) plans fled fixed annuity products backed by

5    the general account of a single insurance company due to concerns about single

6    entity credit and liquidity risk. Following the high-profile default failures of GIC

7    Issuers in 1992 and 1993 by Executive and Confederation Life, the Federal Reserve

8    expressed concerns about the high risk of the insurance company general account

9    products and the flimsy nature of the state guarantees backing the insurance

10   contracts.  The industry immediately responded by offering more separate account

11   contracts, which put creditors in line ahead of general account contracts but still

12   resulted in 100% single entity credit and liquidity exposure.  Synthetic value was

13   created in 1995 and by 1999 most the largest plans were in a synthetic based stable

14   value fund.  Synthetic Stable value continued to gain market share over the next 20

15   years going into smaller and smaller plans.  Some general account and separate

16   accounts have existed in plans under $1 billion because of a lack of litigation until

17   recently.

18        133.   In September 2010 the trade group for State Government 401(k) plans,

19   the National Association of Government Defined Contribution Administrators,

20   (NAGDCA), created a brochure with the following characterization of insurance

21   company general account stable value funds. "Due to the fact that the plan sponsor

22   does not own the underlying investments, the portfolio holdings, performance, risk,

23   and management fees are generally not disclosed.  This limits the ability of plan

24   sponsors to compare returns with other SVFs [stable-value funds]. It also makes it

25   nearly impossible for plan sponsors to know the fees (which can be increased

26   without disclosure) paid by participants in these funds—a critical component of a

27   fiduciary's responsibility.

28

134.   In this case, Prudential placed the proceeds of the stable value fund in a insurance company separate account at Prudential.   Prudential received spread fees – the difference between the returns made by Prudential on the assets in the segregated account and the crediting rate paid to participants. Insurance company balance sheets also allow the company to leverage the assets and have tax advantages that add to profits and return for the insurance company.

135.   An insurance company GIC, such as the Prudential GIC here, is also subject to the single entity credit risk of the insurance company that issues the contract. The crediting rate, set in advance by the insurance company and reset from time to time in its sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.   Thus, Defendants had the opportunity and duty to evaluate the investment in advance; this is not a case of judging an investment with the benefit of hindsight.   Further, Defendants should have specifically negotiated in the contract that Prudential was a fiduciary and that it could exit at no costs if Prudential was downgraded for any reason.   The Prudential single entity annuity contract also constrains liquidity and the ability to replace it with exit charges.

136.   There is substantial liquidity risk because there is no outside market for these contracts.

137.   As of the beginning of 2022, the Prudential GIC had $44,048,624 of assets for which Prudential charged an "administrative fee" plus earned an undisclosed "spread."

138.   Prudential has full control over spread fees and thus has the ability to set (and manipulate) crediting rates.

139.   As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the GIC and to remove or replace it where a substantially identical investment option can be obtained from the same provider at a lower cost. *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee

1  cannot ignore the power the trust wields to obtain favorable investment products,
2  particularly when those products are substantially identical -- other than their lower
3  cost -- to products the trustee has already selected.").

4       140.   In addition to subjecting Plan participants to excessive spread fees, the
5  funds invested in the Prudential stable value account also were not adequately
6  diversified.

7       141.   The risk and return characteristic of the fund depended entirely on the
8  creditworthiness and rates declared by a single entity, Prudential.

9       142.   ERISA § 1104(a)(1)(C) provides that a fiduciary shall discharge his
10  duties "by diversifying the investments of the plan so as to minimize the risk of large
11  losses, unless under the circumstances it is clearly prudent not to do so."

12       143.   The Prudential stable value fund is not diversified. The Prudential GIC
13  is a contract subject to the single entity credit risk of Prudential as the issuer of the
14  contract. The return of the investment depends on crediting rates set at the discretion
15  of a single provider, Prudential. The crediting rate, set by Prudential alone, is not tied
16  to the performance of a diversified pool of assets in which the investors in the fund
17  have an interest.

18       144.   There may be circumstances under which it may clearly be prudent not
19  to diversify the assets of a plan invested in a stable value fund, but this is not such a
20  case. Here, Prudential pocketed excess fees and failed to provide the rate of return
21  that would ordinarily compensate for the Plan's failure to fully diversify its
22  investments.

23       145.   A prudent fiduciary – that is, a fiduciary who monitors the investment,
24  understands the pricing mechanism, and informs itself of the crediting rates and
25  spread fees available in the market – would have known that Prudential's stable
26  value product would underperform and that being a stable value product it would
27  continue to underperform in a stable manner.   A prudent fiduciary would also
28  understand the risks of a product that depends on the credit of a single entity.

146.  A plan the size of Ventura Foods' Plan has considerable bargaining power in the marketplace. There are any number of stable value products available to plans that are simply not available to plans with funds of a smaller size.

147.  To take advantage of this bargaining power, Defendants, should have submitted requests for proposal to stable value fund providers. Products from any number of providers were available with better products, lower fees, and higher crediting rates.

148.  On information and belief, Defendants did not make a regular practice of submitting requests for proposal for the stable value fund.

149.  Other plans with stable value assets of this size have bid out their stable value funds and obtained better products.

150.  Investing Plan funds in the Prudential stable value fund was imprudent and it should have been removed from the Plan.

## CLASS ACTION ALLEGATIONS

151.  Plaintiff brings this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

152.  All participants in or beneficiaries of the VENTURA FOODS 401(K) PLAN from six years prior to the filing of the complaint in this matter through the date of judgment (the "Class Period").

153.  The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Plan has approximately 3,000 participants with account balances.

154.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual class members, including, *inter alia*:

(a)  whether Defendants are fiduciaries of the Plan;

(b)  whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

(c)  whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d)  whether Defendants breached their duty to monitor other fiduciaries of the Plan; and

(e)  the extent of damage sustained by Class members and the appropriate measure of damages.

155.   Plaintiff's claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

156.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

157.   Plaintiff has no interests that conflict with those of the Class. Defendant does not have any unique defenses against Plaintiff that would interfere with their representation of the Class.

158.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

//

//

//

CLASS ACTION COMPLAINT

# FIRST CAUSE OF ACTION

## Breach of Fiduciary Duty of Prudence

## (Against All Defendants)

159.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

160.   Defendants were fiduciaries of the Plan under ERISA §§ 3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

161.   As a fiduciary of the Plan, Defendants were required, pursuant to ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

162.   Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

//

163.   As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants selected and retained investment options in the Plan despite their high cost and poor performance relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

164.   In addition, Defendants failed to monitor or control excessive compensation paid for recordkeeping services which resulted from the unnecessary payment of recordkeeping and other services both directly and as a percentage of assets.

165.   In addition, Defendants failed to monitor or control excessive compensation paid for shareholder or financial advising services which resulted from the unnecessary payment of those services as a percentage of assets.

166.   Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

167.   As a direct and proximate result of these breaches, the Plan, Plaintiff and members of the Putative Class suffered substantial losses in the form of higher

fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiff or any member of the Class, pursuant to ERISA §§ 502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§ 1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers

### (Against All Defendants)

168.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

169.   Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

170.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

171.   Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

172.    Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiff and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain expensive and poorly performing investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

(d) failing to institute competitive bidding for covered service providers.

173.    As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiff and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

174.    Pursuant to ERISA § 502(a)(2) and (a)(3), and ERISA § 409(a), 29 U.S.C. § 1132(a)(2) and (a)(3), and 29 U.S.C. § 1109(a), Defendant is liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

1

**PRAYER FOR RELIEF**

2        Plaintiff, on behalf of the Plan and all similarly situated Plan participants and

3    beneficiaries, respectfully requests the Court:

4        • Certify the Class, appoint Plaintiff as class representative, and appoint

5            Christina Humphrey Law, P.C. and Tower Legal Group, P.C. as Class

6            Counsel;

7        • Find and declare that Defendants have breached their fiduciary duties

8            as described above;

9        • Find and adjudge that Defendants are liable to make good to the Plan

10           all losses to the Plan resulting from each breach of their fiduciary

11           duties, and to otherwise restore the Plan to the position it would have

12           occupied but for the breaches of their fiduciary duties;

13       • Determine the method by which Plan losses under 29 U.S.C. § 1109(a)

14           should be calculated;

15       • Order Defendants to provide an accounting necessary to determine the

16           amounts Defendants must make good the Plan under § 1109(a);

17       • Impose a constructive trust on any monies by which Defendants were

18           unjustly enriched as a result of breaches of fiduciary duty or prohibited

19           transactions, and cause Defendants to disgorge such monies and return

20           them to the Plan;

21       • Surcharge against Defendants and in favor of the Plan all amounts

22           involved in any transactions which an accounting reveals were

23           improper, excessive, and/or in violation of ERISA;

24       • Order equitable restitution against Defendants;

25       • Award to Plaintiff and the Class their attorney's fees and costs under

26           29 U.S.C. § 1132(g)(1) and the common fund doctrine;

27       • Order the payment of interest to the extent it is allowed by law; and

28

1      • Grant other equitable or remedial relief as the Court deems
2         appropriate.

3

4   **PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE**
5                          **BY LAW.**

6

7

8   Dated: December 21, 2022          **CHRISTINA HUMPHREY LAW, P.C.**
                                       **TOWER LEGAL GROUP, P.C.**
9

10

11                          By:

12                                 CHRISTINA A. HUMPHREY
13                                 ROBERT N. FISHER
                                   JAMES A. CLARK
14                                 RENEE P. ORTEGA

15                                 *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT