**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
Robert N. Fisher (SBN 302919)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
christina@chumphreylaw.com
rob@chumphreylaw.com

**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Sacramento, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
james.clark@towerlegalgroup.com
renee.ortega@towerlegalgroup.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

JIM GRAMSTAD and AISAN
ROUHANINIA ATHARI, individually
and as representatives of a Putative
Class of Participants and Beneficiaries,
on behalf of all similarly situated
participants and beneficiaries on behalf
of the VENTURA FOODS, LLC
PROFIT SHARING 401(K) PLAN,

          Plaintiff,

      v.

VENTURA FOODS, LLC and DOES 1
through 10,

          Defendants.

Case No. 8:22-cv-02290-JWH-JDE

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION …………………………………...………..…………1

JURISDICTION AND VENUE………………………..……………….……3

THE PARTIES………………………………………………..…..………….......4

   Plaintiffs…………..………………………………………..……………4

   Defendants………………......…………………………………….………… 5

DEFENDANTS' FIDUCIARY OBLIGATIONS….………….……...…………. 6

DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE

FEES………………………………………………………………………...........8

THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS RELIED

UPON FOR THE COMPLAINT'S ALLEGATIONS…………………….……...9

FACTUAL ALLEGATIONS……………………………...………………...........10

     A.    Defendants Paid Transamerica and Gallagher and other Covered

           Service Providers Unreasonable Fees, Failed to Monitor their Covered

           Service Providers, and make Requests for Proposals from Other

           Covered Service Providers………..…....................................................10

     B.    Defendants Caused the Plan Participants to Pay Excessive Fees and

           Lose Returns by Failing to Offer, Monitor, and Investigate Available

           Lower Cost Mutual Share Classes as Plan Investment Options….…....18

     C.    Defendants Maintained Imprudent Funds that Fell Below the

           Reasonable Standard of Care and Which Lagged in Benchmark

           Comparisons…………………………………………………………29

     D.    Defendants Imprudently Maintained the Plan's Investment in the

           Prudential Guaranteed Income Stable Value Fund, When Other

           Investment Vendors Offered Superior Alternatives……………….....36

           1.   Prudential's Excessive Spread Fees………………………….......38

           2.   Failure to Submit RFP's………………………………………….40

           3.   Failure to Diversify………………………………..…………40

-ii-

CLASS ACTION ALLEGATIONS……………...........….….…………………....42

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence (Against All Defendants)………………………………………………………………......43

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers (Against All Defendants)……..………………………….…………………………….……..46

PRAYER FOR RELIEF………………………………………………....…..…..47

Plaintiff Jim Gramstad and Aisan Rouhaninia Athari ("Plaintiffs"), individually and as a representative of participants and beneficiaries of the VENTURA FOODS, LLC PROFIT SHARING 401(K) PLAN, (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA", 29 U.S.C. §§ 1001 *et seq.*, on behalf of the Plan against current Plan sponsor, VENTURA FOODS, LLC and John Does 1-10 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.      This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 401k retirement plan and certain selected funds. The 401k plan has become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers. This action is filed to recover funds owed back to the plan on behalf of employees / participants / beneficiaries. These retirement funds are significant to the welfare of the class.

2.      Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").

3.      The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits. However, Defendants have not followed ERISA's standard of care. This lawsuit is filed after careful consultation with experts and review of publicly available documents to return benefits taken from Plan participants by Defendants.

4.      The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2021, the Plan had 2,954 total participants and $322,701,158 in assets.

5.      ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1).  A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id.* A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

6.      Specifically, Defendants breached their fiduciary duties of prudence and loyalty to the Plan by:

a. Overpaying for Covered Service Providers by paying variable direct and indirect compensation fees through revenue sharing arrangements with the funds offered as investment options under the Plan, which exceeded costs incurred by plans of similar size with similar services and which were in excess of and not tethered to the services provided;

b. Offering and maintaining funds with higher-cost share classes when identical lower cost class shares were available and could have been offered to participants resulting in participants/beneficiaries paying unnecessary

costs for services that provided no value to them and resulted in a reduction of compounded return gains;

c. Retaining and Offering poorly performing funds within the Plan which failed to meet or exceed industry standard benchmarks including Morningstar category indices and best fit indices as determined by Morningstar.

d. Deprived participants of compounded returns through the excessive costs and investment in expensive underperforming funds;

 and

e. Failing to maintain and restore trust assets.

7.     Plaintiffs were injured during the Relevant Time Period by the Defendants' flawed processes in breach of their fiduciary duties. As a result of Defendant's actions, participants invested in subpar investment vehicles and paid additional unnecessary operating expenses and fees with no value to the participants and resulting in a loss of compounded returns.

8.     Plaintiffs, individually and as representatives of a putative class consisting of the Plan's participants and beneficiaries, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9.     Plaintiffs brings this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C. §1132(e)(1).

11. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, Plaintiff resides and was employed in this District, and because ERISA provides for nationwide service of process.

12. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b) because Plaintiff was employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## THE PARTIES

*Plaintiffs*

13. Plaintiff Jim Gramstad resides in Fullerton, CA and is an employee of Ventura Foods, LLC and worked for Ventura Foods, LLC in this district. Gramstad was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action. As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct. Gramstad was damaged by the Defendants' breaches of their fiduciary duties which impacted the Plan as a whole and damaged all Plan participants.

14.   Plaintiff Athari resides in Pomona, CA and was an employee of Ventura Foods, LLC and worked for Ventura Foods, LLC in this district.  Athari is  current participant, and has been a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action  As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct. Athari was damaged by the Defendants' breaches of their fiduciary duties which impacted the Plan as a whole and damaged all Plan participants.

15.   Plaintiffs Gramstad and Athari have standing under 29 U.S.C. § 1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and insouciant actions caused actual harm to an ERISA plan in which the Plaintiff participates. Plaintiff suffered an injury in fact by, *inter alia*, being forced to pay excessive fees to Fund service providers, investing in higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan, being offered funds which failed to perform at or above their benchmarks, and being deprived of a high quality and secure stable value investment option. Defendants are liable to the Plan for the Plan's losses under 29 U.S.C. § 1109(a).

***Defendants***

16.   Defendant Ventura Foods, LLC ("Ventura Foods") is the current sponsor of the Plan and maintains its principal place of business at 40 Pointe Drive, Brea, CA 92821. Ventura Foods is registered with the State of California, and upon information and belief, operates as a sponsor and administrator and/or fiduciary of the Plan.

17.   Defendant "Does" or the names of the individuals on the Board of Directors and related Committee(s), including the Plan's Investment Committee, if

1    such committee exists, as well as the Plan's manager, and Ventura Foods's officers

2    during the Relevant Time Period are unknown at this time and are named as "John

3    Does" until the "Does" are known and can be named through amendment to this

4    Complaint.

5         18.    Ventura Foods, the Board of Directors, the Plan Investment

6    Committee, the Plan's manager, and the Directors and Officers are fiduciaries to the

7    Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they have sole authority to

8    amend or terminate, in whole or part, the Plan or the trust, and have discretionary

9    authority to control the operation, management and administration of the Plan,

10   including the selection and compensation of the providers of administrative services

11   to the Plan and the selection, monitoring, and removal of the investment options

12   made available to participants for the investment of their contributions and provision

13   of their retirement income.

14        19.    The Plan is in the top 100 of plans in Orange County. Based on average

15   account balances, Plaintiffs and the putative class have average accounts of over

16   $100,000 which is over two times larger than participants across the USA.

17        20.    Finally, although not named as a Defendants at this time, certain service

18   providers are relevant parties to this Litigation.

19        21.    Ventura Foods contracted with Gallagher Benefit Services

20   ("Gallagher"), to serve as the Plan's Investment Advisor.

21        22.    Ventura Foods contracted with Transamerica Retirement Solutions

22   ("Transamerica"), to serve as the Plan's recordkeeper. Transamerica served as the

23   Plan's recordkeeper during the relevant time period based on Schedules C certified

24   returns filed by Ventura Foods.

25        23.    Ventura Foods contracted with State Street Bank and Trust Company

26   ("State Street") to serve as Trustee. In this capacity, State Street received and held

27   the assets of the Fund on behalf of the Participants and Beneficiaries.

28

FIRST AMENDED CLASS ACTION COMPLAINT

24. Ventura Foods had a concomitant fiduciary duty to monitor and supervise those appointees and contracted parties.

**DEFENDANTS' FIDUCIARY OBLIGATIONS**

25. ERISA and common law trusts imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

26. 29 U.S.C. § 1104(a)(1)(B) and common law require a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

27. A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. at 1829.

28. 29 U.S.C. § 1106(a)(1)(C) and § 1108(b)(2) and the common law allow a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." Gallagher and Transamerica are "parties in interest" under 29 U.S.C. § 1106(a)(1)(C).

29. 29 U.S.C. § 1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

30. Section 1109(a) and common law provide "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

1  "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the
2  trust beneficiaries to the position they would have occupied but for the breach of
3  trust." Restatement (Second) of Trusts § 205(c) (1959).

**DEFINED CONTRIBUTION 401(K) PLANS
AND THE IMPACT OF EXCESSIVE FEES**

6      31.    In a defined contribution plan, participants (and sometimes their
7  employer) make contributions to plan participant's individual accounts. Participants'
8  retirement benefits are limited to the value of their own individual accounts, which is
9  determined solely by employee and employer contributions plus any investment
10  gains less plan and investment expenses. *See* 29 U.S.C. § 1002(34). Plan
11  Participants' investments are held in trust. Typically, plan participants direct the
12  investment of their accounts, choosing from the lineup of plan investment options
13  chosen by the plan sponsor.

14      32.    Because retirement savings in defined contribution plans are intended to
15  grow and compound over the course of the employee participants' careers, poor
16  investment performance and excessive fees can dramatically reduce the amount of
17  benefits available when the participant is ready to retire. Over time, even small
18  differences in fees and performance compound which can result in vast differences
19  in the amount of savings available at retirement. As the Supreme Court explained,
20  "[e]xpenses, such as management or administrative fees, can sometimes significantly
21  reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*,
22  135 S. Ct. at 1825. In short, the damages caused by breaches of fiduciary duties to
23  the Plan cause damages that continue to accrue and compound over time.

24      33.    In fact, the impact of excessive fees on employees' and retirees'
25  retirement assets is dramatic. The U.S. Department of Labor has noted that a 1%
26  higher level of fees over a 35-year period makes a 28% difference in retirement

27
28

1   assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k)
2   Plan Fees, at 1–2 (Aug. 2013).[1]

3         34.     As a simple example, if a beneficiary invested $10,000, the investment
4   grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year,
5   at the end of the 40-year period the beneficiary's investment would be worth
6   $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at
7   the end of the 40-year period would decrease to $93,142 and $85,198, respectively.
8   Beneficiaries subject to higher fees for materially identical funds lose not only the
9   money spent on higher fees, but also "lost investment opportunity"; that is, the
10  money that the portion of their investment spent on unnecessary fees would have
11  earned over time.

12        35.     Accordingly, courts have recognized that plan fiduciaries "cannot
13  ignore the power the trust wields to obtain favorable investment products,
14  particularly when those products are substantially identical—other than their lower
15  cost—to products the trustee has already selected." *Tibble v. Edison International*,
16  843 F.3d 1187, 1198 (9th Cir. 2016).

17        36.     The marketplace for retirement plan services is established and
18  competitive. As of December 31, 2021, the Plan had 2,954 active participants and
19  $322,701,158 in assets. As a result, the Plan has the tremendous bargaining power to
20  demand low-cost administrative and investment management services and well-
21  performing, low-cost investment funds.

22        **THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS**
23            **RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS**

24        37.     Defendants' Annual Returns/Reports of Employee Benefit Plan to the
25  U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public

26  _____

27  [1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-
28  activities/resourcecenter/publications/401kFeesEmployee.pdf

1    Inspection" and available for download from www.efast.dol.gov for forms filed in

2    2010 and onward).

3        38.    Plaintiff also requested Defendants Plan governing documents and this

4    Complaint is based in part on the limited documents provided by Defendants.

5        39.    The underlying allegations in this Complaint are based on Plaintiff's

6    documents as well as the Defendants' past Forms 5500 filed with U.S. Departments

7    of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses

8    found at https://www.sec.gov/edgar/searchedgar.

9                       **FACTUAL ALLEGATIONS**

10   **A.**    **Defendants Paid Transamerica and Gallagher and other Covered**

11          **Service Providers Unreasonable Fees, Failed to Monitor their Covered**
         **Service Providers, and make Requests for Proposals from Other**

12          **Covered Service Providers**

13        40.    Defendants have a duty to prudently select covered service providers

14    ("CSPs"). Courts that have considered the issue have made it clear that "the failure to

15    exercise due care in selecting . . . a fund's service providers constitutes a breach of a

16    trustee's fiduciary duty." 28 U.S.C. § 1108(b)(2) states that services must be

17    necessary for the plan's operation. Department of Labor guidance has also

18    emphasized the importance of prudently selecting service providers.[2] The DOL has

19    observed that, when selecting a service provider, "the responsible plan fiduciary

20    must engage in an objective process." *Id*. Such a process must be "designed to elicit

21    information necessary to assess . . . the reasonableness of the fees charged in light of

22    the services provided." *Id*.

23        41.    Recordkeeping is a necessary service for every defined contribution

24    plan. Recordkeeping services for a qualified retirement plan, like the Plan, are

25    essentially fixed and largely automated. It is a system where costs are driven purely

26    by the number of inputs and the number of transactions. In essence, it is a computer-

27    based bookkeeping system.

28

---

[2] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

FIRST AMENDED CLASS ACTION COMPLAINT

42.     The cost of recordkeeping and administrative services depends on the number of participants, not the amount of assets in the participant's account.

43.     The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

44.     Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

45.     Recordkeepers for defined contribution plans are generally compensated in two ways: First, through direct payments from the plan (participants) or employer; and second, through indirect payments via a practice known as revenue sharing.

46.      In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include Rule 12b-1 fees, which are paid by the Funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of Fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered.

47.      Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can

-11-

1   be obtained from the recordkeeping market through competitive bids. Defendants did
2   not do that here.

3        48.    Nor were revenue sharing fees printed on the participants' statements.

4        49.    Because revenue sharing payments are asset-based, they bear no relation
5   to the actual cost to provide services or the number of plan participants and can result
6   in the payment of unreasonable recordkeeping fees. To put it another way,
7   recordkeepers (or any other CSP) receiving unchecked revenue sharing
8   compensation accrue significant ongoing pay increases simply as a result of
9   participants putting money aside biweekly for retirement. Additional funds come
10  from interest, dividends and capital gains.

11       50.    Thus, for example, in 2017, the Plan paid Transamerica approximately
12  $718,000 even though Transamerica had provided the same services for
13  approximately $584,516 the year before.

14       51.    Since 2016 the number of plan participants with account balances
15  increased 20%, but the recordkeeping fees increased 35% over the same time period
16  (through the end of 2021).

17       52.    In 2013, Defendants chose Transamerica to serve as the Plan's
18  recordkeeper with Gallagher to serve as investment advisor from 2012 to the present.

19       53.    Plaintiffs calculate the recordkeeping fees based on the direct and
20  indirect compensation levels shown on thePlan's Form 5500s filed with the
21  Department of Labor covering the years between 2013 and 2021. The Form 5500
22  Schedule C lists direct compensation dollars only, however, they make up less than
23  half of the total compensation received by the Transamerica as calculated by the rate
24  of each fund's revenue sharing. The formula for the indirect compensation (revenue
25  sharing) is provided in the Supplemental Schedule to the Notes to Financial
26  Statements in each of the applicable Forms 5500.

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

54.    Based on these calculations, the Plan paid much more than a reasonable fee for Transamerica, resulting in the Plan paying millions of dollars in excessive fees as shown in the tables below.

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| Per person recordkeeping fee | $237.32 | $ 272.30 | $ 245.88 | $ 263.98 | $ 267.69 | $ 262.85 |



FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13    55.    Based on the number of Plan participants and the assets in the Plan, a
14    reasonable recordkeeping fee for the Plan is approximately $40 per participant (15th
15    Annual    NEPC    2020    Defined    Contribution    Plan    &    Fee    Survey:
16    https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20
17    Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

18    56.    The WAICU Retirement Readiness Plan is a comparably sized plan to
19    the Ventura Foods Plan that also receives recordkeeping services from Transamerica.
20    In its 2021 Form 5500, the WAICU Plan indicates that it had 3,496 participants with
21    account balances and approximately $404,000,000 in plan assets.

22    57.    Based on the information in the WAICU plan's 2021 Form 5500, it paid
23    Transamerica $135,530 in direct compensation for recordkeeping services in 2021
24    and did not pay any indirect compensation through revenue sharing as virtually all of
25    the funds offered by the WAICU plan to its participants used the institutional share
26    classes and no revenue sharing paid to Transamerica was disclosed.

27    58.    Thus, the WAICU plan participants paid $38.77 per person to
28    Transamerica for recordkeeping services in 2021.

59.     In addition to Transamerica, there are numerous recordkeepers in the marketplace who are capable

of providing a high level of service to the Plan, and who will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

60.     The package of recordkeeping services the Plan received included standard recordkeeping services such as government reporting services, plan sponsor support services, recordkeeping services, and plan investment services and reporting.

61.     The Plan did not receive any unique services or at a level of quality that would warrant fees far greater than the competitive fees that would be offered by other providers as the Plan was charged by Transamerica.

62.     Plaintiffs requested but were not provided with "service provider contracts" which would allow Plaintiffs to identify the precise services provided by Transamerica.

63.     However, recordkeeping services are largely standardized because the recordkeepers must provide these services at scale to a large number of plans and must comply with regulatory requirements.   They cannot offer bespoke sets of services to each individual plan.

64.     The bulk of the fee paid for recordkeeping services pays for core recordkeeping services that do not vary from plan to plan.

65.     In this regard, for large plans like this Plan, recordkeeping services are offered in a bundle with standardized services including, but not limited to, recordkeeping, transaction processing, participant communications, plan document services to ensure compliance with new legal and regulatory requirements, plan consulting services including regarding investment selection, accounting and audit services such as Form 5500 preparation, and compliance support and testing.

66.     Some other services may be added on an ad-hoc basis including, loan processing, brokerage services, distribution services, and processing of qualified domestic relations orders but the addition of such services would not have a dramatic impat on the cost of recordkeeping services.

67.     Indeed the Plan itself is a standardized prototype (not individually drafted) like 99% of other plans.  As indicated by the Plan auditors (Miller Kaplan LLC): "The Plan adopted a Prototype Volume Submitter 401(k) Profit Sharing Plan document sponsored by Transamerica Retirement Solutions, LLC, which received an opinion letter from the Internal Revenue Service dated March 31, 2014."

68.     The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like the Ventura Foods Plan with large numbers of participants and a large amount of assets.

69.      The unreasonable fees paid to covered service providers through revenue sharing arrangements directly resulted from the Defendants' choice of improper mutual fund share classes and failing to monitor the providers.

70.     The mutual funds paid annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Plan participants who invested in those funds. The Plan participants realized lower returns on their investments because they paid higher fund operating expenses.

71.     Plaintiffs were able to obtain a quote for Plan recordkeeping services from an unconflicted brokers who reviewed the Plan's audit reporting detailing management's depiction of the plan's operation. The plan document and plan's operation is discussed every plan year in the Form 5500 under "Note 1 – Description of the Plan." All cash contributions were reviewed for the past six years as well as the payments to terminated employees. The investment menu was reviewed and the number of total accounts over time was reviewed.

72.     This quote was provided on a per person basis rather than the asset-based recordkeeping fees the Plan paid to Transamerica, which as explain above,

FIRST AMENDED CLASS ACTION COMPLAINT

1  cause the Plan to pay excess fees as Plan assets increase that are not tied to the
2  services provided.

3        73.    The vendor was able to provide substantially lower prices for
4  recordkeeping services than what Transamerica charged the Plan and consistent with
5  ~$40/head reflected in the NEPC report.

| TRANSAMERICA<br>Recordkeeping Fees | #<br>Participants | Total fees based on<br>vendor quote at<br>$41/head |
|---|---|---|
| $695,585.00 | 2829 | $115,427.03 |

        74.    Transamerica's fees so far exceeded reasonable recordkeeping fees to
the point that no differentiation in services could explain the level of recordkeeping
fees paid by the Plan.

        75.    The clear explanation for this is that Defendants have a flawed and
reckless provider selection process that is "tainted by failure of effort, competence,
or loyalty." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

        76.    As discussed below, in most years, many of the funds offered to the
participants had less expensive share classes available. Defendant's use of higher
cost share classes to pay service provider costs is the most inequitable, inefficient
and expensive method available.

        77.    Defendants clearly failed to use the Plan's bargaining power to
leverage its CSPs to charge lower administrative fees for the Plan participants or by
bidding the Plan out to other service providers.

        78.    Defendants further failed to take any or adequate action to monitor,
evaluate or reduce their service provider fees, such as:

        a.  Choosing mutual fund share classes with lower revenue sharing for the
            Plan;

        b.  monitoring costs to compare with the costs being charged for similar sized
            plans in the marketplace; or

c.  negotiating to cap the amount of revenue sharing or ensure that any
    excessive amounts were returned to the Plan.

79.   The amount of compensation paid to CSPs vastly exceeds any DOL and IRS prohibited transaction "reasonable compensation" exemption for "cost plus reasonable profit."

80.   In sum, the Plan unreasonably paid broker dealer intermediaries like Gallagher and Transamerica fees far in excess of what the Plan needed to pay for their services and these fees were not tethered to the actual services rendered, but rather increased based on revenue sharing of a larger corpus of Plan funds over time.

81.   ERISA holds fiduciaries "to a high standard of care and diligence" regarding fees: Fiduciaries must, among other things, "[e]stablish a prudent process for selecting investment options and service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor investment options and service providers once selected to make sure they continue to be appropriate choices." Additionally, The Department of Labor has consistently reminded ERISA fiduciaries of their responsivities to carefully evaluate fees when selecting plan investment options and then monitor fees on an ongoing basis. Defendants breached their fiduciary duties by failing to conduct themselves accordingly.

**B.   Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options**

82.   An ERISA fiduciary's evaluation of plan investments must be focused solely on economic considerations that have a material effect on the risk and return of an investment based on appropriate investment horizons, consistent with the plan's funding policy and investment policy objectives. The corollary principle is that ERISA fiduciaries must never sacrifice investment returns, take on additional investment risk, or pay higher fees to promote non-pecuniary benefits or goals.

83.     A fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may not sacrifice investment return or take on additional investment risk to promote non-pecuniary benefits or goals such as to seek to burden participants/beneficiaries with fund expenses such as SEC Rule 12b-1 fees, subtransfer agency fees, shareholder servicing fees, commissions, finder's (incentive) fees or other types of fees just so their selected covered service providers are paid from participants/beneficiaries.

84.     The weight given to any pecuniary factor by a fiduciary should appropriately reflect a prudent assessment of its impact on risk-return. Revenue sharing always costs more (evidence follows) than the credit the Defendants are seeking to offset the receipt of an invoice by their chosen covered service providers.

85.     In the context of ERISA retirement plans such interests must be understood to refer to "financial" rather than "nonpecuniary" benefits, and Federal appellate courts have described ERISA's fiduciary duties as "the highest known to the law."

86.     Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

87.     Mutual funds often offer multiple "classes" of their shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class.

88.     A mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund to one share class, while charging a higher class share in that same fund an expense ratio of .50%. Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her

1    investment compared to an investor who purchases the share class with the higher

2    operating expense. Generally, lower class shares are available to larger investors,

3    such as 401(k) plans like the Plan.

4         89.    Plans that invest their participants' funds in lower share classes and

5    subject them to higher fees engage in share class violations which are the most clear

6    and obvious breaches of fiduciary duties in the Plan. *See Tibble v. Edison*, 2017 U.S.

7    Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017) ("Because the institutional share

8    classes are otherwise identical to the retail share classes, but with lower fees, a

9    prudent fiduciary would know immediately that a switch is necessary.").

10        90.    Since at least 2016, Defendants have offered higher cost mutual fund

11   share classes as investment options for the Plan even though at all times lower cost

12   class shares of those exact same mutual funds were readily available to the Plan.

13        91.    Indeed, Defendants have provided as many as 14 fund choices with

14   clear share class violations.

15        92.    Defendants selected the Plan's investment options. In this case, on

16   information and belief, Transamerica, the Plan's recordkeeper, and Gallagher, the

17   Plan's investment advisor, provided Defendants with a universe of pooled

18   investment options from which to select a subset to offer Plaintiff and the other Plan

19   participants.

20        93.    Defendants chose and continued to maintain a pool of investment

21   options, including those offered by Transamerica and Gallagher at the expense of

22   participants and beneficiaries of the Plan by routinely offering higher cost share

23   classes rather than readily available lower cost options.

24

25

**Summary Table**

| | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 |
|---|---|---|---|---|---|---|
| Total Funds # | 32 | 31 | 31 | 31 | 31 | 32 |
| Cheaper Shares Classes Available # | 8 | 11 | 12 | 13 | 13 | 14 |
| Cheaper Shares Classes Available % | 25% | 35% | 39% | 42% | 42% | 44% |

26

27

28

94.     Every fund invested in expensive share classes was imprudently selected and retained.   In this regard, evaluation of certain exemplar funds shows that Defendants' selection and retention of expensive share classes reflected a lack of prudent processes because investing in expensive share classes causes return lags compared to investments in less expensive share classes and offers the Plan no pecuniary benefit and the Plan could easily have switched to the less expensive share classes but failed to do so.

95.     The use of expensive share classes was likely motivated by an improper desire to hide fees from Plan participants by using revenue sharing to pay fees instead of directly drawing them from the Plan or Defendants being billed directly for the fees.   But as demonstrated below, the fund invested in share classes that charged excess fees which created a drag on fund performance that was not justified by the desire to generate fees for revenue sharing.

**American Funds Small Cap World A—Lack of "experience and expertise"**

96.     As reflected in the Table below, the Defendants' chose and kept the bolded "A" expensive class of the American Funds Small Cap World fund which also offered an identical but cheaper "R6" class in 2009.   The only difference between the share classes is the fees charged to investors and the concomitant reduction in investment gains for the higher fee share class.

97.     The difference between the choice of the A Class and R6 class cannot be justified based on the need for revenue sharing because the A cost 1.1%/yr while the cheaper R6 cost 0.71%/yr (in 2016) and that difference exceeds the credit of 0.24% in revenue-sharing for 12b-1 fees.

98.     Second, the yield difference caused losses to the Plan greater than the revenue-sharing credit of 0.24 %/yr. Plaintiffs and putative class made 74.12% over the past 5 years while the Defendants caused them to lose the opportunity to make another 3.46% (74.12-77.58). That equals 0.69% per year which vastly exceeds the Defendants' desired revenue-sharing credit of 0.24%/yr.

FIRST AMENDED CLASS ACTION COMPLAINT

| A | B | D | E | F | G | H |
|---|---|---|---|---|---|---|
| Name | Symbol | *Diff>RS | Inception Date | 5-Year Total | Yield 12-Month | SEC 30-Day Yield |
| *American Funds SMALLCAP World A (Defs')* | *SMCWX* | *14.824* | *4/30/1990* | *74.12* | *0.35* | *0.04* |
| American Funds SMALLCAP World R6 (cheaper, same) | RLLGX | 15.516 | 5/1/2009 | 77.58 | 0.71 | 0.39 |

99.   Based on SEC-prospectus at www.sec.gov/edgar, (1) minimum investment amounts were waived for qualified retirement plans (QRP) and "omnibus trusts" and (2) these classes above could have been "switched" anytime by the Defendants These two classes have always used the same managers, with the same holdings (Denning/Kawaja/Grace/Lee; start date 12/31/1991).  The only difference is that the more expensive share class performed worse because of the excess fee burden.

100.   A prudent fiduciary would have recognized that the investment in an expensive share class was directly eroding the Plan's gains from the investments and would have switched to the cheaper share class.

101.   Other fiduciaries in similar circumstances have migrated Plan funds to cheaper share classes in recognition of the fact that investment in the more expensive share class is not in the pecuniary interest of the Plan.

102.   This holds true for all of the funds where Defendants selected a more expensive share class.

103.   Rather than benefiting the Plan, the use of expensive share classes benefits the investment advisor at the expense of the Plan because it generates excess fees which are only partially rebated over a period of time to the Plan and may also generate additional kickbacks to the investment advisor.

104.   A prudent fiduciary would have recognized that the investment in an expensive share class was directly eroding the Plan's gains from the investments and would have switched to the cheaper share class.

FIRST AMENDED CLASS ACTION COMPLAINT

105.   Other fiduciaries in similar circumstances have migrated Plan funds to cheaper share classes in recognition of the fact that investment in the more expensive share class is not in the pecuniary interest of the Plan.

106.   The following chart illustrates the differences in the operating costs and returns between the share classes chosen by Defendants and the least expensive share class available as of January 1, 2016 for funds that were in the Plan during the entire six year period ending December 31, 2021.

107.   The fund name listed in the first row and shaded grey represents the share class chosen by Defendants. The second fund name listed and not shaded represents the cheaper share class Defendants should have chosen which was available to them throughout the duration of the Plan. The bolded line represents the difference in costs (expenses charged), 12-month yield and the investment returns for the one- and annualized three- and five-year – and six year performance periods ending 12/31/2021.

108.   Additionally, to highlight the harm caused by the Defendants' imprudent selection of high-cost share classes, the three-five-six- year cumulative returns are included, which shows the compounding effect of excess fees paid over the course of each year.

**COST OF EXPENSIVE SHARE CLASSS FOR FUNDS IN PLAN THROUGHOUT ENTIRE CLASS PERIOD**
**Cumulative (Total) Returns**
**(Ending 12/31/21)**

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 6-Year Total | 6-Year % / 6* | 2016 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|
| T. Rowe Price Blue Chip Growth Advisor (2016) | 0.95 | 17.39 | 104.44 | | 185.22 | | $31,413,361 | |
| T. Rowe Price Blue Chip Growth I | 0.56 | 17.85 | 106.88 | | 192.16 | | | |
| *Cost of Expensive Share Classes* | *-0.39* | *-0.46* | *-2.45* | *-0.82* | *-6.94* | *-1.16* | | *-$2,180,449.45* |

FIRST AMENDED CLASS ACTION COMPLAINT

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 6-Year Total | 6-Year % / 6* | 2016 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|
| Columbia Dividend Income A (2013) | 0.92 | 25.99 | 73.16 | | 125.08 | | $8,762,426 | |
| Columbia Dividend Income Inst3 | 0.56 | 26.45 | 75.08 | | 130.33 | | | |
| *Cost of Expensive Share Classes* | *-0.36* | *-0.46* | *-1.92* | *-0.64* | *-5.25* | *-0.88* | | *-$459,830.04* |
| Janus Henderson Enterprise A (2016) | 1.13 | 16.97 | 89.03 | | 162.73 | | $1,164,004 | |
| Janus Henderson Enterprise N | 0.66 | 17.50 | 91.61 | | 170.02 | | | |
| *Cost of Expensive Share Classes* | *-0.47* | *-0.53* | *-2.59* | *-0.86* | *-7.29* | *-1.22* | | *-$84,834.42* |
| Virtus Ceredex Mid-Cap Value Equity A (2012) | 1.28 | 28.73 | 68.15 | | 106.00 | | $1,516,084 | |
| Virtus Ceredex Mid-Cap Value Equity R6 | 0.79 | 29.34 | 70.76 | | 113.00 | | | |
| *Cost of Expensive Share Classes* | *-0.49* | *-0.61* | *-2.61* | *-0.87* | *-7.00* | *-1.17* | | *-$106,125.97* |
| Janus Henderson Triton A (2012) | 1.29 | 6.74 | 75.02 | | 130.79 | | $2,926,037 | |
| Janus Henderson Triton N | 0.66 | 7.21 | 77.40 | | 137.16 | | | |
| *Cost of Expensive Share Classes* | *-0.63* | *-0.47* | *-2.38* | *-0.79* | *-6.37* | *-1.06* | | *-$186,421.39* |
| American Funds Europacific Growth A (2009) | 0.80 | 2.50 | 62.39 | | 81.23 | | $7,834,729 | |
| American Funds Europacific Growth R6 | 0.46 | 2.84 | 64.11 | | 85.04 | | | |
| *Cost of Expensive Share Classes* | *-0.34* | *-0.33* | *-1.73* | *-0.58* | *-3.81* | *-0.64* | | *-$298,547.91* |

-24-

FIRST AMENDED CLASS ACTION COMPLAINT

| Name | Expense Ratio % | 1-Year % Total | 3-Year Total | 3-Year % / 3* | 6-Year Total | 6-Year % / 6* | 2016 BOY Assets | Returns Lost for Using Expensive Share Class |
|---|---|---|---|---|---|---|---|---|
| American Funds SMALLCAP World A (2009) | 1.02 | 10.27 | 98.16 | | 140.03 | | $23,196,859 | |
| American Funds SMALLCAP World R6 | 0.65 | 10.66 | 100.39 | | 145.41 | | | |
| *Cost of Expensive Share Classes* | *-0.37* | *-0.39* | *-2.22* | *-0.74* | *-5.39* | *-.90* | | *-$1,249,367.05* |
| Invesco Developing Markets A (2012) | 1.20 | -7.50 | 34.44 | | 70.16 | | $1,343,651 | |
| Invesco Developing Markets R6 | 0.81 | -7.13 | 36.08 | | 74.42 | | | |
| *Cost of Expensive Share Classes* | *-0.39* | *-0.37* | *-1.64* | *-0.55* | *-4.26* | *-0.71* | | *-$57,278.67* |
| American Funds Income Fund of Amer A (2009) | 0.56 | 17.38 | 46.52 | | 74.30 | | $6,434,545 | |
| American Funds Income Fund of Amer R6 | 0.25 | 17.73 | 47.86 | | 77.42 | | | |
| *Cost of Expensive Share Classes* | *-0.31* | *-0.35* | *-1.33* | *-0.44* | *-3.12* | *-0.52* | | *-$200,905.22* |

\* The 3-Year %/3 and 6-Year %/6 figures illustrate that the cost to participants in lost returns is typically greater than the charged annual expenses. This lost return differential is not adequately expressed in the annualized figures.

109.   Defendants may seek to explain that they offered higher cost share classes with higher fee burdens by pointing to the Plan's ability to use those fees for revenue sharing arrangements. But this does not justify the increased fees and lost returns imposed on Plan participants. Rather, empirically speaking, revenue sharing burdens on mutual fund investors are *always* more costly than the revenue sharing credit offered by the corresponding mutual fund share class.

FIRST AMENDED CLASS ACTION COMPLAINT

110.   In other words, investing Plan assets in higher cost share classes does not benefit plan participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants.

111.   The use of share classes to create funds for revenue sharing does not justify the increased fees and lost returns imposed on Plan participants.  Rather, empirically speaking, revenue sharing burdens on mutual fund investors are always more costly over time than the revenue sharing credit offered by the corresponding mutual fund share class.

112.   In addition, because rebates are only made after a set period of time, the Plan effectively lends out the rebated funds until such time as the rebate comes through, rather than keeping them in the Trust and accruing gains during that time.

113.   Moreover, Plan participants are generally not aware of the fee burden that their 401k accounts bear from indirect fees. Unlike direct fees, which are clearly listed on participants' statements, indirect fees are unshown and unknown to those paying those costs.

114.   Indeed, because not all funds generate fees for revenue sharing, only those participants invested in the revenue sharing funds pay for the revenue sharing and the other participants get a free ride – which is impermissible discrimination against participants.

115.   Likewise, the rebate formula used may not equitably return funds to participants if participants make withdrawals or transfer out of the fun prior to the credit being posted.

116. Further, by focusing on funds with expensive share classes that generated high funds for revenue sharing, the Plan limited the universe of funds available for selection and selects funds based on revenue generating share classes as opposed to the best interests of the Plan itself.

FIRST AMENDED CLASS ACTION COMPLAINT

117.   Because the Plan could have invested in identical mutual funds with a lower cost share class, the Defendants' actions were directly erosive to the trust's growth.

118.   Defendants thus caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on many of the mutual funds offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments.

119.   In selecting share classes with higher fees, Defendants demonstrated a lack of basic skill and prudence when selecting investments.

120.   Not only did the Defendants fail to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants, they did not need to as the fund assets qualified them to meet any minimum initial investment requirements. Furthermore, to the extent they did not explicitly meet the minimum asset requirement, many mutual fund companies will waive those requirements in qualified plans.

121.   Lastly, the information available for Defendants to make an informed assessment as to costs and returns available for each share class and to make the assessments noted above was made available in each fund's annual prospectus at the time the choices were made and Defendants also could and should have had processes in place to monitor the share classes of the Plan's investments but failed to put in place such processes.

122.   The Defendants' actions to choose high-cost funds demonstrates a lack of prudence. For example, as shown in the chart above, the T. Rowe Price Blue Chip Growth expensive share class had fees of ninety-five basis points (0.95%/yr) as opposed to the share class with lower fees of fifty-six basis points (0.56%/yr). The total fees paid for the share class with higher fees was therefore thirty-nine basis points per year (0.39%/yr).

123.   In other words, Defendants caused Plan participants who invested in that T. Rowe Price fund to pay .39% more in fees than necessary and permitted plan's contracted recordkeeper and/or financial advisor to collect a portion of those increased fees.

124.   Additionally, an analysis of each attribute of the different share classes reveals that there is <u>no</u> difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants.

125.   Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs."   Uniform Prudent Investor Act (the "UPIA") §7.

126.   As is evident from the allegations in the Complaint, Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by the offering of higher cost share classes as Plan investment options when lower cost options of the same funds were available.

127.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.   The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return on the Plan participants' investments, resulted in millions of dollars of damages to participants.

//

//

**C.      Defendants Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care and Which Lagged in Benchmark Comparisons**

128.   Mutual fund portfolio managers choose a benchmark index to use in their prospectus as a comparison for evaluating fund performance often referred to as the Primary Prospectus Benchmark ("PPBM").

129.   However, in addition to the PPBM selected by the fund managers themselves, third parties may provide more appropriate comparators for each fund than the fund-selected comparator.

130.   Morningstar, Inc. ("Morningstar") is one such third party and a respected financial services company that provides research and analytics that are used throughout the asset management industry.

131.   In 1996, Morningstar created category classifications to help investors make meaningful comparisons between mutual funds.

132.   "Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested" and Morningstar "solved this problem by breaking portfolios into peer groups based on their holdings" which "help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios."[3]

133.   Per Morningstar,

[t]he driving principles behind the classification system are as follows:

- Individual portfolios within a category invest in similar types of securities and therefore share the same risk factors (for example, style risk, prepayment risk).
- Individual portfolios within a category can, in general, be expected to behave more similarly to one another than to portfolios outside the category.
- The aggregate performance of different categories differs materially over time.

---

[3] http://morningstardirect.morningstar.com/clientcomm/morningstar_categories_us_april_2016.pdf

- Categories have enough constituents to form the basis for reasonable peer group comparisons.
- The distinctions between categories are meaningful to investors and assist in their pursuit of investing goals.[4]

134.   Critically, Morningstar determined that funds may select broad-based market comparators as their primary benchmark and that the funds may reflect a "low degree of correlation" with the corresponding benchmark.[5]

135.   In order to provide a better measure of fund performance, Morningstar publishes data on each fund's performance compared to Morningstar selected benchmarks.

136.   First, the Morningstar Category Index ("MCI") is a category specific index that allows investors and advisors to compare fund performance to benchmarks that may be a better fit to the true makeup of a fund than the fund-selected PPBM.

137.   MCIs are commonly used as comparators in investment selection, monitoring and reporting tools used by investment managers and 401(k) investment committees. MCI comparisons can be beneficial because they typically represent the weighted returns of the vast majority of investments within a specific asset-class (i.e. large-cap growth or small-cap value) which allows those selecting and monitoring investments to better identify risk and return derivations between the mutual funds they are reviewing.

138.   Second, Morningstar selects a Best-Fit Index ("BFI") for each fund based on the composition of the fund over the prior 36-month period.[6]  Because the fund is highly correlated to its BFI, comparison of a fund to its BFI makes it is easier to determine how much of a fund's movements are based on the movements of the index, the relative level of risk a portfolio manager is taking, and ultimately whether a portfolio manager is adding value.

---

[4] *Id.*
[5] https://www.morningstar.com/articles/372237/understanding-best-fit-versus-standard-indexes
[6] *Id.*

139.   The MCI and BFI are strong comparators and useful tools for evaluating fund performance because portfolio managers of funds with the same investment purpose make buy and sell decisions based on the same pool of investments (stocks and/or bonds). These benchmarks help investors determine whether a specific portfolio manager has skill determining what assets to hold within that pool and how much to over/underweight certain investments and when to buy and sell.

140.   When evaluating fund performance, a prudent fiduciary considers data on a fund's performance against all relevant benchmarks including its MCI and BFI when evaluating fund performance because those comparators evaluate whether the fund is performing well based on the actual purpose and design of the fund.

141.   Here, as demonstrated in the charts below, several of the funds offered by   the Plan during the statutory period showed poor performance during the statutory period as compared to both their MCI and BFI.

**Challenged Funds' Cumulative Returns vs Best Fit Index[1]**

| Year Selected | Year Removed | Ticker | Fund Name | Best-Fit Index (BFI) | +/- BFI since Selection [2] | +/- BFI For Prior Six Year Period | Cost to Participants during Prior Six Year Period [3] |
|---|---|---|---|---|---|---|---|
| 2016 | In Plan | PABGX | T. Rowe Price Blue Chip Growth Adv | Morningstar US LM Brd Growth TR USD[7] | (24.22) | (24.22) | ($7,606,843.06) |
| 2012 | In Plan | ODMAX | Invesco (Oppenheimer) | MSCI EM NR USD[8] | 11.66 | (7.90) | ($106,081.33) |

[7] Morningstar US Large-Mid Broad Growth TR (BFI) is an appropriate benchmark comparison for T. Rowe Price Blue Chip Growth because the fund's investment strategy is to "normally invest at least 80% of its net assets (including any borrowings for investment purposes) in the common stocks of large and medium-sized blue chip growth companies." Nine of T. Rowe's top 10 holdings are in Morningstar's top 11 and account for 54% of the fund's assets. Eighty-four percent (84%) of the fund's assets are similarly allocated across the same 12 sectors.

[8] MSCI EM NR (PPBM, BFI and MCI) is an appropriate benchmark comparison for Invesco Developing Markets because the fund chose the index as its prospectus benchmark, it was determined by Morningstar to be the best-fit and it is used to compare all funds within the emerging markets assets class. Seventy-eight percent (78%) of the funds are assets are invested in

-31-

| Year Selected | Year Removed | Ticker | Fund Name | Best-Fit Index (BFI) | +/- BFI since Selection [2] | +/- BFI For Prior Six Year Period | Cost to Participants during Prior Six Year Period [3] |
|---|---|---|---|---|---|---|---|
| | | | Developing Markets A | | | | |
| 2009 | 2019 | OAKBX | Oakmark Equity and Income Investor | Russell Mid Cap Value TR USD | (5.41) | (2.39) | ($391,020.41) |
| | | | | | | | ($8,103,944.80) |

## Challenged Funds' Cumulative Returns vs Morningstar® Category Index[1]

| Year Selected | Year Removed | Ticker | Fund Name | Morningstar Category Index (MCI) | +/- MCI since Selection [2] | +/- MCI For Prior Six Year Period | Cost to Participants during Prior Six Year Period [3] |
|---|---|---|---|---|---|---|---|
| 2016 | In Plan | PABGX | T. Rowe Price Blue Chip Growth Adv | Russell 1000 Growth TR USD[9] | (45.74) | (45.74) | ($14,367,521.70) |
| 2012 | In Plan | ODMAX | Invesco (Oppenheimer) Developing Markets A | MSCI EM NR USD | 11.66 | (7.90) | ($106,081.33) |

the same regions as its prospectus benchmark and 84% of its assets are similarly allocated across the same 12 sectors. Additionally, MSCI EM NR is used in the fee disclosure notices offered to the plan sponsor and plan participants, as well as the fund's own fact sheet available to all investors.

[9] Russell 1000 Growth TR (MCI) is also an appropriate benchmark comparison for T. Rowe Price Blue Chip Growth. The MCI is the most commonly used benchmark to compare funds within the same asset class (i.e. large growth) and can help identify fund managers that have exhibited skill as well as those that have not. As with the Morningstar benchmark, the assets of T. Rowe are invested similarly to the Russell 1000 Growth. Eight of T. Rowe's top 10 holdings are in Russell's top ten and account for 52% of the fund's assets. Eighty-three percent (83%) of the fund's assets are similarly allocated across the same 12 sectors. Additionally, Russell 1000 Growth is used in the fee disclosure notices offered to the plan sponsor and plan participants, as well as the fund's own fact sheet available to all investors.

| Year Selected | Year Removed | Ticker | Fund Name | Morningstar Category Index (MCI) | +/- MCI since Selection [2] | +/- MCI For Prior Six Year Period | Cost to Participants during Prior Six Year Period [3] |
|---|---|---|---|---|---|---|---|
| 2009 | 2019 | OAKBX | Oakmark Equity and Income Investor | Morningstar Mod Agg Tgt Risk TR USD[10] | (1.81) | (2.15) | ($351,013.27) |
|  |  |  |  |  |  |  | ($14,824,616.30) |

1) Table based on data through 12/31/2021
2) "Since selection" is based on year selected through the last full year held in the plan
3) Based on 2016 beginning year assets

142.   As shown in the tables above, Defendants breached their duty to the Plan to engage in an ongoing process to cull poorly performing funds from the Plan resulting in millions of dollars of losses to the Plan.

143.   For example, a prudent fiduciary would not have continued to invest the Plan's funds in the T. Rowe Price Blue Chip Growth Fund and would have offered a different growth investment option rather than subjecting participants to continue to suffer losses.

144.   In this regard, the T. Rowe Price Blue Chip Growth fund had a single highly regarded manager from 1993 until 2021. The fund had already begun to perform poorly in 2019, trailing its MCI by 6.77%.  As early as 2020, it was reported that this long-time manager would transition out of the fund in the near future and new fund manager began to take the reigns as associate portfolio manager at the beginning of 2020.

145.   This should have sent up a red flag. Indeed, in August of 2020, Morningstar downgraded the fund.

146.   The fund has, in fact, performed poorly during and since the transition, including trailing its MCI by 4.13% in 2020 and 10.21% in 2021.

---

[10] Given the great diversity in the investable options in the Allocation –70% to 85% Equity asset class Morningstar Mod Agg Tgt Risk is an appropriate benchmark comparison for Oakmark Equity and Income as it is the most commonly used benchmark to compare funds within this specific asset class.

147.   The fund likewise underperformed other comparable funds as determined by Morningstar, performing in the 4th quartile for its Morningstar category in 2016 and again in the 4th quartile in 2019 and the 3rd quartile in 2021.

148.   Currently, Morningstar has assigned a 2 star rating to the fund. The funds 3-year performance is rated as a dreadful single star, with a 2 star 5-year performance ranking and only a 3-star 10-year performance ranking.

149.   Rather than gambling on the fund's uncertain future success, a prudent fiduciary would have removed the fund based on its poor performance and/or new management during the statutory period.

150.   Instead, Defendants have continued to maintain the Plan's investment in the fund through at least November 30, 2022.

151.   During the course of 2022, the fund was down 38.64%  and performed in nearly the bottom 10% of its Morningstar category. Accordingly, Defendants continued refusal to make the prudent move of removing the fund has caused further damages to the Plan. On top of this, as discussed above, the Plan has improperly maintained a more expensive share class causing Plan participants who invested in this fund to pay excessive fees.

152.   As of March 31, 2023 the fund ranks in the bottom quartile and nearly bottom decile in its Morningstar category for the year.

153.   Likewise, the Plan fiduciaries should have removed the Invesco (Oppenheimer) Developing Markets fund from the Plan based on consistent and longstanding underperformance.

154.   The fund, which has a single benchmark as its PPBM, BFI, and MCI, underperformed its benchmark during the Class Period.

155.   This underperformance began in 2014 and included years of underperformance in 2016, 2017, 2020, 2021, and continuing through 2022.

156.   During that time, the fund was in the 4th quartile for performance in its Morningstar category in 2014 and 2021 and thus far in 2022, and in the 3rd quartile

FIRST AMENDED CLASS ACTION COMPLAINT

1    in 2015-17 and was in the 3rd or 4th quartile for 4 straight years from 2014-17.

2    These poor peer rankings serve to emphasize that it would not have been difficult to

3    identify a more prudent investment option.

4         157.   On top of this, as discussed above, the Plan has improperly maintained a

5    more expensive share class causing Plan participants who invested in this fund to pay

6    excessive fees.

7         158.   So too, the Oakmark Equity and Income Investor fund should have been

8    removed from the Plan prior to 2019 when it was finally removed.

9         159.   The fund lagged its PPBM, MCI, and BFI during the Class Period.

10        160.   It also had a number of years of poor performance prior to and during

11   the Class Period and appeared in the third and fourth quartile compared to its

12   Morningstar category peers in 2009 (4th), 2010 (4th), 2012 (4th), 2015 (4th), 2017

13   (3rd), 2018 (3rd), and 2019 (4th).

14        161.   On top of this, the Plan improperly maintained a more expensive share

15   class causing Plan participants who invested in this fund to pay excessive fees.

16        162.   Defendants have a continuing duty to evaluate the Plan funds and

17   remove underperforming funds.

18        163.   Defendants were or should have been aware of the continuous

19   underperformance of the funds enumerated in the charts and discussed above and

20   removed the funds from the Plan.

21        164.   Defendants' failure to remove these funds from the Plan reflects either

22   that Defendants failed to put in place a prudent investment monitoring process or

23   failed to engage in that process.

24        165.   Accordingly, Defendants breached their fiduciary duties by failing to

25   remove the funds resulting in financial losses to the Plan and its participants.

26   //

27

28

**D.    Defendants Imprudently Maintained the Plan's Investment in the Prudential Guaranteed Income Stable Value Fund, When Other Investment Vendors Offered Superior Alternatives**

166.    The Prudential Guaranteed Income Stable Value Fund (Guaranteed Investment Account or "GIC")) is a type of stable value fund.

167.    Stable value products, including guaranteed investment contracts, are not required to be registered with the SEC. Single Company fixed annuity contracts are structured as an insurance company general account, or an insurance company separate account, and are solely regulated by the State Insurance Commissioner selected by the insurance company. There are also synthetic based stable value funds, which are run by a Registered Investment Advisor (RIA) regulated by the SEC.    The differences between the different types of funds are critical from a fiduciary standpoint.    The Prudential GIC was an insurance company general account product.

168.    A stable value account in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides higher consistent returns over time. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term bond fund.    The stability of assets enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value.    Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds. [11] Single fixed annuity contracts are set by

---

[11] *See* Stable Value Fund v. Money Market Fund, Financial Web describing difference between stable value funds and money market funds), available at: http://www.finweb.com/investing/stable-value-fund-vs-money-marketfund/html#axzz44EaLfQnQ.

FIRST AMENDED CLASS ACTION COMPLAINT

1  the insurance company at their discretion which typically maximizes profit to the

2  insurance company and minimizes returns to participants which is a fiduciary breach.

3      169.   There are several different types of stable value accounts in the 401(k)

4  marketplace. Large plans often offer "synthetic" stable value funds, which are the

5  least risky, because principal is guaranteed by multiple "wrap providers"[12] and the

6  fund owns the assets of the underlying funds. Separate account products, where the

7  assets of the underlying funds are held in the separate account of an insurance carrier

8  are riskier, because there is only one "wrap" provider. As a result, they offer higher

9  crediting rates. General account products, such as the Prudential GIC, where the

10  funds are held unrestricted in the general account of the insurance carrier, are the

11  riskiest type of stable value funds and consequently offer the highest rates.

12      170.   While the majority of plans the size of Defendants use a lower risk

13  synthetic stable value product, there are still some Separate Account and General

14  Account products.

15      171.   The Prudential GIC is a general account product established pursuant to

16  a contract between Defendants and Prudential. The investment funds are deposited

17  by Prudential in its general account, which enables Prudential to earn a "spread"

18  representing by the difference between the crediting rate and the returns earned by

19  Prudential from general account funds. The Prudential GIC also was subject to the

20  single entity credit risk of Prudential, the issuer of the contract. The crediting rate, set

21  in advance by Prudential and reset from time to time in Prudential's sole discretion,

22  is not tied to the performance of a diversified pool of assets in which the investors in

23  the fund have an interest. Thus, Defendants had the opportunity and duty to evaluate

24  the investment in advance; this is not a case of judging an investment with the

25  benefit of hindsight.

26

27  [12] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and
    insurance companies. Wrap contracts guarantee a certain return even if the underlying investments

28  decline in value. To support that guarantee, a wrap contract relies on both the value of the
    associated assets and the financial backing of the wrap issuer.

172.   As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the Prudential GIC and to remove or replace it where a substantially identical investment option can be obtained from the same provider at a lower cost. *See, e.g.*, *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected.").

### 1.   *Prudential's Excessive Spread Fees*

173.   Defendants did not have a viable methodology for monitoring the costs or performance of the Prudential GIC. Not only were comparable products available from other providers with higher crediting rates, but identical or substantially identical products were available to Defendants from Prudential and other stable value providers with higher crediting rates and lower spread fees. While not all information is publicly available for comparison purposes,[13] limited documentation for the second half of 2022 showed a 1.55% crediting rate paid by Prudential to Plan participants; while at the end of 2021, Prudential paid over double, a crediting rate of 3.2%, for the same product to participants in the Cigna 401(k) Plan.

174.   The 1.55% crediting rate paid to the Plan participants by Prudential was one of the lowest crediting rates paid to a plan by any GIC in the second half of 2022.

175.   Higher spread fees result in lower crediting rates. This difference, more than 2% per year on average, is the excess spread that Defendants failed to monitor and rectify. Taking inflation into account, the difference in real dollar terms was

---

[13] In September 2010 the trade group for State Government 401(k) plans, the National Association of Government Defined Contribution Administrators, (NAGDCA), created a brochure with the following characterization of insurance company general account stable value funds. "Due to the fact that the plan sponsor does not own the underlying investments, the portfolio holdings, performance, risk, and management fees are generally not disclosed. This limits the ability of plan sponsors to compare returns with other SVFs [stable-value funds]. It also makes it nearly impossible for plan sponsors to know the fees (which can be increased without disclosure) paid by participants in these funds—a critical component of a fiduciary's responsibility."

even more pronounced, with real (net of inflation) returns for the Defendants' fund near zero.

176.   Defendants did not have to scour the marketplace to find a better performing fund, it simply had to make an effort, which it failed to make, to determine whether the same fund was available at a lower cost. Fact sheets showing the available rates of market rate Prudential funds and similar products from other providers were readily available had Defendants exercised even a minimal amount of due diligence.

177.   This breach of fiduciary duty alone resulted in a loss (before compounding) in excess of $5 million of participants' retirement savings. This loss is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid. There is a crucial distinction in evaluating a stable value product's returns against investment returns available elsewhere, from the standpoint of how a fiduciary's choice is to be evaluated. The product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows prior to the date the product is selected what the returns will be six months in advance.

178.   The plan fiduciary also knows that, because of the manner in which crediting rates are calculated, the product is less sensitive to interest rates than bond funds. Consequently, a stable value product that performs well generally continues to perform well, in a stable manner. A stable value product that performs poorly, such as Defendants' product, generally continues to perform poorly, in a stable manner.

179.   A prudent fiduciary – that is, a fiduciary that monitors the investment, understands the pricing mechanism and informs itself of the crediting rates and spread fees available in the market – would have known that Prudential's stable value product would underperform and that being a stable value product it would continue to underperform in a stable manner.

180.  Defendants could have done substantially better for participants with other substantially identical risky insurance separate account products.  In addition, as set forth in more detail below, there are substantially similar risky insurance separate account products such as some from Mass Mutual with over double the return of 4% and higher which are far more cost efficient.

### 2.    *Failure to Submit RFP's*

181.  A plan with a $44 million stable value fund has considerable bargaining power in the marketplace. There are any number of stable value products available to plans with a $44 million stable value fund that are simply not available to plans with funds of a smaller size.

182.  To take advantage of this bargaining power, Defendants should have also submitted requests for proposal to other stable value fund providers. Products from any number of providers were available with better products, lower fees, and higher crediting rates.  For example, at the end of 2022, TIAA-CREF Retirement Choice paid 6.50%, over 4 times higher than Prudential's 1.55% crediting rate, for a similar product.

183.  Other plans with stable value assets of this size have bid out their stable value funds and obtained better products. Upon information and belief, Defendants did not make a regular practice of submitting requests for proposal for the stable value fund.  Thus, Defendants were not able to take advantage of better rates.  As a result, participants sustained substantial losses during the proposed class period.

### 3.    *Failure to Diversify*

184.  The funds invested in the Prudential GIC stable value account were also not adequately diversified. The risk and return characteristic of the fund depended entirely on the creditworthiness and rates declared by a single entity, Prudential.

185.  ERISA § 1104(a)(1)(C) provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

186.   The Prudential Guaranteed Interest stable value fund is not diversified. The Prudential GIC is a contract, a piece of paper, subject to the single entity credit risk of Prudential, as the issuer of the contract. The return of the investment depends on crediting rates set at the discretion of a single provider, Prudential. The crediting rate, set by Prudential alone, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.

187.   In recent years, large 401(k) plans fled fixed annuity products backed by the general account of a single insurance company due to concerns about single entity credit and liquidity risk.  Following the high-profile default failures of GIC Issuers in 1992 and 1993 by Executive and Confederation Life, the Federal Reserve expressed concerns about the high risk of the insurance company general account products and the flimsy nature of the state guarantees backing the insurance contracts. The industry immediately responded by offering more separate account contracts, which put creditors in line ahead of general account contracts but still resulted in 100% single entity credit and liquidity exposure. Synthetic value was created in 1995 and by 1999, most of the largest plans were in a synthetic based stable value fund. Synthetic Stable value continued to gain market share over the next 20 years going into smaller and smaller plans.

188.   For example, in the "Notes to Financial Statements" attached to Defendants' 2021 5500 Form, p. 10, Note 7 – Guaranteed Income Fund, there is a warning that "[t]he Plan's ability to receive amounts is dependent on PRIAC's (Prudential Retirement Insurance and Annuity's) ability to meet its financial obligation.  There are no reserves against contract value for credit loss.  Certain events might limit the ability of the Plan to transact at contract value include premature termination of Plan investments in the Guaranteed Investment Account."

189.   If Defendants were going to continue to offer a stable value fund, the most prudent choice would be for Defendants to move to a low-cost lower risk synthetic GIC structure.  Further, Defendants should have specifically negotiated in

1  the contract that Prudential was a fiduciary and that it could exit at no costs if

2  Prudential was downgraded for any reason.  The single entity annuity contract

3  constrained liquidity and the ability to replace it without incurring exit charges.

4      190.   Defendants breached their fiduciary duty by offering the unnecessarily

5  risky Prudential GIC product and by offering a share class that did not maximize

6  Plan Participants' returns.

7                    **CLASS ACTION ALLEGATIONS**

8      191.   Plaintiff brings this action in a representative capacity on behalf of the

9  Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil

10  Procedure on behalf of themselves and a Class defined as follows:

11      192.   All participants in or beneficiaries of the VENTURA FOODS 401(K)

12  PLAN from six years prior to the filing of the complaint in this matter through the

13  date of judgment (the "Class Period").

14      193.   The members of the Class are so numerous that joinder of all members

15  is impracticable. The disposition of their claims in a class action will provide

16  substantial benefits to the parties and the Court. The Plan has approximately 3,000

17  participants with account balances.

18      194.   Questions of law and fact common to the members of the Class

19  predominate over questions that may affect individual class members, including,

20  *inter alia*:

21      (a)  whether Defendants are fiduciaries of the Plan;

22      (b)  whether Defendants breached their fiduciary duty of prudence with

23      respect to the Plan;

24      (c)  whether Defendants had a duty to monitor other fiduciaries of the Plan;

25      (d)  whether Defendants breached their duty to monitor other fiduciaries of

26      the Plan; and

27      (e)  the extent of damage sustained by Class members and the appropriate

28      measure of damages.

195.   Plaintiff's claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

196.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

197.   Plaintiff has no interests that conflict with those of the Class. Defendant does not have any unique defenses against Plaintiff that would interfere with their representation of the Class.

198.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty of Prudence

### (Against All Defendants)

199.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

200.   Defendants were fiduciaries of the Plan under ERISA §§ 3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment

1  options for the Plan, and/or the negotiation over services and fees for the Plan,

2  and/or were responsible for the administration and operation of the Plan.

3  201.  As a fiduciary of the Plan, Defendants were required, pursuant to

4  ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the

5  exclusive purpose of: (i) providing benefits to participants and their beneficiaries;

6  and (ii) defraying reasonable expenses of administering the plan"; and "(B) to

7  discharge their duties on an ongoing basis with the care, skill, prudence, and

8  diligence under the circumstances then prevailing that a prudent man acting in a like

9  capacity and familiar with such matters would use in the conduct of an enterprise of

10  a like character and with like aims."

11  202.  Common law and ERISA's duty of prudence required Defendant to give

12  appropriate consideration to those facts and circumstances that, given the scope of its

13  fiduciary investment duties, it knew or should have known were relevant to the

14  particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §

15  2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty

16  to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at

17  1828.

18  203.  As described above, Defendants failed to act prudently and in the best

19  interest of the Plan and its participants and breached its fiduciary duties in various

20  ways. Defendants failed to make decisions regarding the Plan's investment lineup

21  based solely on the merits of each investment and what was in the best interest of

22  Plan participants. Defendants selected and retained investment options in the Plan

23  despite their high cost and poor performance relative to other comparable

24  investments and failed to investigate the availability of lower-cost share classes of

25  certain mutual funds in the Plan. A prudent fiduciary in possession of this

26  information would have removed these investment options, replaced them with more

27  prudent and lower cost alternatives, and/or used the size, leverage and bargaining

28

1   power of the Plan to secure significantly reduced fees for comparable investment
2   strategies.

3       204. In addition, Defendants failed to monitor or control excessive
4   compensation paid for recordkeeping services which resulted from the unnecessary
5   payment of recordkeeping and other services both directly and as a percentage of
6   assets.

7       205. In addition, Defendants failed to monitor or control excessive
8   compensation paid for shareholder or financial advising services which resulted from
9   the unnecessary payment of those services as a percentage of assets.

10      206. Defendants knowingly participated in each fiduciary breach of the other
11  Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan
12  fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own
13  duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and
14  failed to make any reasonable and timely effort under the circumstances to remedy
15  the breaches. Accordingly, each defendant is also liable for the losses caused by the
16  breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

17      207. As a direct and proximate result of these breaches, the Plan, Plaintiff
18  and members of the Putative Class suffered substantial losses in the form of higher
19  fees or lower returns on their investments than they would have otherwise
20  experienced. Additionally and regardless of the losses incurred by Plaintiff or any
21  member of the Class, pursuant to ERISA §§ 502(a)(2) and (a)(3), and 409(a), 29
22  U.S.C. §§ 1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants
23  and any non-fiduciary which knowingly participated in these breaches are liable to
24  disgorge all profits made as a result of Defendant's breaches of the duties of loyalty
25  and prudence, and such other appropriate equitable relief as the Court deems proper.

26  //
27  //
28  //

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers**

**(Against All Defendants)**

208.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

209.   Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

210.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

211.   Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

212.   Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for substantially identical investment products readily available elsewhere, as detailed herein;

(b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiff and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain expensive and poorly performing investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

(d) failing to institute competitive bidding for covered service providers.

213.   As a direct and proximate result of these breaches of the duty to monitor the Plan, Plaintiff and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

214.   Pursuant to ERISA § 502(a)(2) and (a)(3), and ERISA § 409(a), 29 U.S.C. § 1132(a)(2) and (a)(3), and 29 U.S.C. § 1109(a), Defendant is liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests the Court:

- Certify the Class, appoint Plaintiff as class representative, and appoint Christina Humphrey Law, P.C. and Tower Legal Group, P.C. as Class Counsel;

- Find and declare that Defendants have breached their fiduciary duties as described above;

1        •   Find and adjudge that Defendants are liable to make good to the Plan
2           all losses to the Plan resulting from each breach of their fiduciary
3           duties, and to otherwise restore the Plan to the position it would have
4           occupied but for the breaches of their fiduciary duties;
5        •   Determine the method by which Plan losses under 29 U.S.C. § 1109(a)
6           should be calculated;
7        •   Order Defendants to provide an accounting necessary to determine the
8           amounts Defendants must make good the Plan under § 1109(a);
9        •   Impose a constructive trust on any monies by which Defendants were
10         unjustly enriched as a result of breaches of fiduciary duty or prohibited
11         transactions, and cause Defendants to disgorge such monies and return
12         them to the Plan;
13       •   Surcharge against Defendants and in favor of the Plan all amounts
14         involved in any transactions which an accounting reveals were
15         improper, excessive, and/or in violation of ERISA;
16       •   Order equitable restitution against Defendants;
17       •   Award to Plaintiff and the Class their attorney's fees and costs under
18         29 U.S.C. § 1132(g)(1) and the common fund doctrine;
19       •   Order the payment of interest to the extent it is allowed by law; and
20       •   Grant other equitable or remedial relief as the Court deems
21         appropriate.
22
23     **PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE**
24                                         **BY LAW.**
25
26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT

Dated: April 12, 2023

**CHRISTINA HUMPHREY LAW, P.C.
TOWER LEGAL GROUP, P.C.**


By: _____
CHRISTINA A. HUMPHREY
ROBERT N. FISHER
JAMES A. CLARK
RENEE P. ORTEGA

*Attorneys for Plaintiffs*

-49-

FIRST AMENDED CLASS ACTION COMPLAINT